STEVEN T. GUBNER - Bar No. 156593
JASON B. KOMORSKY - Bar No. 155677
JESSICA L. BAGDANOV – Bar No. 281020
BG LAW LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone: (818) 827-9000
Facsimile: (818) 827-9099
Emails: sgubner@bg.law
jkomorsky@bg.law
jbagdanov@bg.law

Special Litigation Counsel for Timothy J. Yoo,
Chapter 7 Trustee

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br><br>SYNERMED, INC.,<br><br>Debtor. | Case No. 2:23-bk-12123-BB<br><br>Chapter 7<br><br>Adv. No. ___________ |
| TIMOTHY J. YOO, Chapter 7 Trustee,<br><br>Plaintiff,<br>v.<br><br>PACIFIC ALLIANCE MEDICAL CENTER, LTD., a California limited partnership; PACIFIC ALLIANCE MEDICAL CENTER, INC., a California corporation; JOHN R. EDWARDS, an individual; SHI-YIN WONG, an individual; TIT SANG LI, an individual; JAMES MASON, an individual; DR. STEPHEN KWAN, an individual; DR. CARL K. MOY, an individual; DR. T. G. WING CHOW, an individual; DR. GEORGE MA, an individual; ACHIEVAMED, INC., a California corporation; ANNEX FINANCIAL, INC., a California corporation; MCDERMOTT WILL & EMERY, LLP, an Illinois limited liability partnership; and DOES 1 through 10,<br><br>Defendants. | **COMPLAINT FOR:**<br><br>**(1) BREACH OF FIDUCIARY DUTY;**<br>**(2) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;**<br>**(3) CIVIL CONSPIRACY TO BREACH FIDUCIARY DUTY;**<br>**(4) ACTUAL INTENT FRAUDULENT TRANSFER, CAL. CIV. CODE § 3439.04(a)(1);**<br>**(5) CONSTRUCTIVE FRAUDULENT TRANSFER, CAL. CIV. CODE § 3439.04(a)(2);**<br>**(6) TURNOVER OF PROPERTY OF THE ESTATE;**<br>**(7) BREACH OF CONTRACT; AND**<br>**(8) GROSS NEGLIGENCE** |

Plaintiff Timothy J. Yoo, in his capacity as the chapter 7 trustee (the "Trustee" or "Plaintiff") of the bankruptcy estate ("Estate") of debtor SynerMed, Inc. (the "Debtor" or "SynerMed"), a California corporation, hereby brings the following complaint against defendants PAMC, Ltd., a California limited partnership ("PAMC Ltd."); PAMC, Inc., a California corporation ("PAMC, Inc."); John R. Edwards, an individual ("Edwards"); Dr. Shi-Yin Wong, an individual ("Wong"); Dr. Tit Sang Li, an individual ("Li," and collectively with Edwards and Wong, the "Directors"); James Mason ("Mason"), an individual; ; Dr. Stephen Kwan, an individual; Dr. Carl K. Moy, an individual; Dr. George Ma, an individual; Dr. T.G Wing Chow, an individual ("Chow" and with Wong, Li, Kwan, Moy and Ma, the "PAMC Ltd. Board"); Achievamed, Inc. ("Achievamed"); Annex Financial, Inc. ("Annex"); McDermott, Will & Emery, LLP, an Illinois limited liability partnership ("McDermott"); and Does 1-10 (each, a "Defendant," or collectively, the "Defendants"). The Trustee alleges as follows:

## I. NATURE OF PROCEEDING, JURISDICTION, VENUE

1. By and through this complaint (the "Complaint"), the Trustee seeks damages from the Defendants for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, actual intent fraudulent transfers, constructive fraudulent transfers, civil conspiracy to breach fiduciary duty, turnover of property of the Estate, breach of contract, and gross negligence, arising primarily out of a transaction whereby the Debtor purported to sell all of its assets and liabilities to third parties via an asset purchase agreement (the "APA"), detailed below and attached hereto as Exhibit 1, and the resulting wind down of the Debtor. Pursuant to Local Bankruptcy Rule 7008-1, the Trustee consents to the entry of a final order or judgment on this Complaint by this Court.

2. This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 157(b)(1), 157(b)(2)(A), 157(b)(2)(E), 157(b)(2)(H), 157(b)(2)(O), and 1334.

3. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408, 1409.

4. This action is a core proceeding pursuant to 11 U.S.C. §§ 544, 550 and 28 U.S.C. § 157.

5. The Trustee, as the trustee of the Debtor's bankruptcy estate, has authority to pursue all claims and causes of action held by the Debtor's Estate, including the claims stated herein.

6. The Trustee has standing to bring this adversary proceeding on behalf of the Debtor's Estate.

## II. PARTIES TO THE ACTION

7. The Plaintiff is the duly appointed Trustee of the Debtor's bankruptcy estate and acts in this action not individually, but solely in his capacity as chapter 7 trustee.

8. Pacific Alliance Medical Center Ltd. ("PAMC Ltd.") is a California limited partnership, and at all relevant times herein is/was the parent company that owned all of the ownership interests in the Debtor. PAMC Ltd. is owned, operated, and/or controlled by the Debtor's Directors: Edwards, Wong, and Li. PAMC Ltd.'s agent for service of process address is at 531 West College Street, Los Angeles, CA 90012.

9. Pacific Alliance Medical Center, Inc. ("PAMC Inc.") is a California corporation, and at all relevant times herein is/was the general partner of PAMC Ltd., and thus, PAMC Inc. directly controlled the Debtor through PAMC Ltd. The Trustee is informed and believes that PAMC Inc. is owned, operated, and/or controlled by the Debtor's Directors and officers. PAMC Inc.'s agent for service of process address is at 711 West College Street Suite 628, Los Angeles, CA 90012.

10. John R. Edwards ("Edwards") was, at all relevant times herein, an individual that was an officer and/or director and fiduciary of the Debtor. Specifically, Edwards was one of the Debtor's directors, was the Secretary, and was the interim CEO, who appeared and testified on behalf of the Debtor at the § 341 meetings of creditors, and he is also the CEO of PAMC Ltd. On information and belief, Mr. Edwards currently resides in Los Angeles County.

11. Dr. Shi-Yin Wong ("Wong") was, at all relevant times herein, an individual that was an officer and/or director and fiduciary of the Debtor. Specifically, Wong was one of the Debtor's directors, and he is also a director of PAMC Ltd.. On information and belief, Mr. Wong currently resides in Los Angeles County.

12. Dr. Tit Sang Li ("Li") was, at all relevant times herein, an individual that was an officer and/or director and fiduciary of the Debtor. Specifically, Li was one of the Debtor's directors, and he is also a director of PAMC Ltd.. On information and belief, Mr. Li currently resides in Los Angeles County.

13. James Mason ("Mason") was, at all relevant times herein, an individual that was the President and CEO of SynerMed before being replaced with Edwards. On information and belief, Mr. Mason currently resides in Los Angeles County.

14. Dr. Stephen Kwan ("Kwan") was, at all relevant times herein, a director of PAMC Ltd. On information and belief, Mr. Kwan currently resides in Los Angeles County.

15. Dr. Carl K. Moy ("Moy") was, at all relevant times herein, a director of PAMC Ltd. On information and belief, Mr. Moy currently resides in Los Angeles County.

16. Dr. George Ma ("Ma") was, at all relevant times herein, a director of PAMC Ltd. On information and belief, Mr. Ma currently resides in Los Angeles County.

17. D. T.G. Wing Chow ("Chow") was, at all relevant times herein, a director of PAMC Ltd. On information and belief, Mr. Moy currently resides in Los Angeles County.

18. Achievamed, Inc. ("Achievamed") is a California corporation, and at all relevant times herein is/was owned, operated and/or controlled by Takashi Cheng ("Cheng"). Achievamed's principal address and agent for service of process address is Takashi Cheng at 3579 E. Foothill Blvd., #546, Pasadena, CA 91107.

19. Annex Financial, Inc. ("Annex") is a California corporation, and at all relevant times herein is/was owned, operated and/or controlled by Takashi Cheng. Annex's current registration status is suspended by the Franchise Tax Board of California. Annex's principal address and agent for service of process address is Halil Hasic at 560 W. Main Street, #C177, Alhambra, CA 91801.

20. McDermott, Will & Emery ("McDermott") is an Illinois limited liability partnership with its principal place of business in Chicago, Illinois and at all relevant times herein was counsel for the Debtor and, at the same time, counsel for PAMC Ltd. and PAMC Ltd.'s Board with respect to the sale of the Debtor and the wind down of the Debtor, which representations were largely handled by partners in McDermott's Los Angeles office. McDermott was also counsel for SynerMed with respect to ongoing governmental investigations involving the California Department of Managed Health Care, the California Department of Insurance, the United States Attorney's Office, and the United States Department of Health and Human Service. Based upon McDermott's

production, McDermott never disengaged from its representation of SynerMed through the filing of SynerMed's bankruptcy petition.

21. The Trustee is informed and believes, and based thereon alleges, that at all times relevant herein, that each of the foregoing Defendants was acting in concert with the other Defendants, aided and abetted, and in doing the things alleged herein, was acting within the scope of their authority, or apparent authority, as such agent, employee, representative, director, officer and/or aider and abettor, with the advance knowledge, acquiescence, or subsequent ratification of each Defendant.

22. The Trustee is informed and believes, and thereon alleges that each of the Defendants is responsible, negligently, intentionally and/or in some actionable manner, including as corporate successors liable for the acts of their predecessors, for the events referred to herein, and caused and continue to cause injuries and damages legally to Plaintiff, as alleged, either through Defendant's own conduct, or through the conduct of its agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

## III. FACTUAL ALLEGATIONS

### A. Procedural Posture and the Debtor's Bankruptcy Filing

23. On April 7, 2023, the Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code. Edwards signed the petition on behalf of the Debtor, listing $0.00 in assets and $0.00 in liabilities.

24. Despite listing zero assets or liabilities, the Debtor's petition discloses that PAMC Ltd. paid bankruptcy counsel almost $40,000 for filing the Debtor's chapter 7 bankruptcy petition.

25. Postpetition, the Trustee was appointed, in which capacity he continues to serve. After his appointment, the Trustee began investigating the business and financial affairs of the Debtor, including, among other activities: (1) examining Edwards at the Debtor's 341(a) meeting of creditors on August 8, 2023 and January 8, 2024, and (2) obtaining the turnover of documents and also document productions from various parties pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure. The Trustee's investigation to date has uncovered the following information.

The Trustee is the bankruptcy trustee for the bankruptcy estate for the Debtor and is not the Debtor itself. Therefore, the allegations as to pre-petition actions, omissions and documents are based on the Trustee's investigation to date and the turnover and production of books, records and documents.

**B. Background of the Debtor's Business**

26. From 2001 to 2017, the Debtor operated as a management services organization ("MSO") for healthcare practices, and was headquartered in Monterey Park, California. The Debtor was and is a wholly owned subsidiary of PAMC Ltd.

27. The operations of the Debtor and PAMC Ltd. are closely intertwined. On information and belief, PAMC was involved in the Debtor's day to day operations and shared some of the same officers and directors. Notably, as discussed below, when SynerMed's Board approved the APA, it did so on the stated basis that the APA was in PAMC's best interests and, without analysis, that if it was in PAMC's best interest it was necessarily in SynerMed's best interest. In approving the APA discussed herein, the Directors took direction from PAMC Ltd.'s Board and shareholders. On information and belief, after SynerMed sold and transferred its assets to Annex pursuant to the APA, PAMC Ltd. and PAMC Inc. with the material assistance of McDermott continued to control SynerMed and made all operational decisions for SynerMed.

28. Prior to the sale of its business assets described herein, the Debtor provided management services to physician practices and provided services for healthcare plans for Medicaid and Medicare patients in California. The Debtor served as an essential intermediary between healthcare plans and independent physicians' practices, handling insurance contracting, paying claims, and performing other administrative health-related tasks.

29. Specifically, under California's "delegated" health care model, managed care plans such as Medicare and Medi-Cal may contract with Independent Physician Associations ("IPAs") to perform some of the administrative tasks that would normally be performed by the health plan, such as utilization management and care coordination, in addition to providing health services to beneficiaries. The IPAs may, in turn, delegate these administrative tasks to an MSO, like the Debtor.

30. The Debtor's business became successful through the years, and by 2017, the Debtor was the "delegate" for approximately sixteen IPAs and had over 300 employees that assisted in

managing over one million patients and their healthcare information. As of 2014, the Debtor reported net shareholder equity of almost $20 million.

31. On or about August 18, 2017, SynerMed's compliance department received notification from Health Net of an upcoming annual audit relating to functions delegated to SynerMed by Alpha Care Medical Group ("Alpha"), Angeles IPA, Crown City Medical Group ("CCMG"), and MultiCultural Primary Care Medical Group ("Multi").

32. On or about September 27, 2017, and during the course of preparing for that audit, SynerMed's compliance manager, Christine Babu ("Babu"), was advised of the possible submission of falsified denial and provider fax documents in relation to SynerMed's claims processing.

33. As the compliance manager, Babu immediately began the process of investigating the allegations of impropriety.

34. On September 30, 2017, the then general counsel of the Debtor, Renee Delphin-Rodriguez ("Rodriguez"), was provided with a preliminary investigation memo from Babu.

35. By October 3, 2017, Rodriguez had confirmed that denial letters created for audit purposes had not been sent to members or providers and that SynerMed had fabricated fax confirmation sheets.

36. On October 5, 2017, a draft Self-Disclosed Non-Compliance Investigation Report was circulated. The report contained three sections: (1) Background; (2) Findings; and (3) Supporting Evidence. As detailed in the Summary of Findings:

> The Compliance investigation determined that SynerMed's UM department is significantly out of compliance with the requirement to provide member, and provider notifications, and the requirement that necessitates such notices be made in a timely manner. In addition, the department is also in violation of SynerMed's Standards of Conduct, and in violation of the UM delegation oversight contractual requirements as it pertains to: member & provider notifications, the timeliness of such notices & falsification of member & provider notices.

37. On October 5, 2017, the Debtor was the subject of a whistleblower claim presented to the Department of Managed Health Care ("DMHC") alleging deliberate, orchestrated fraud related to specialty referral, grievance handling, and systematic overrides of dates to create compliant

records related to its MSO services. The complaint alleged that a team within the Debtor was improperly processing denial letters to patients, or failing to send denial letters, and was also improperly directing patients to specialists that were cheaper while denying higher cost options for patients.

38. On information and belief, the whistleblower claim arose from the investigation conducted by Babu with respect to the audit issues, which investigation revealed additional material fraud by the Debtor.

39. In light of the Notice of Action Team ("NOA Team") practices uncovered and confirmed by the Debtor's investigation, on October 11, 2017, Rodriguez provided to Mason a summary of recommended human resources and compliance actions to be implemented.

40. The summary prepared by Rodriguez described her conversations with Babu, during which Babu disclosed conversations she had with certain Debtor employees who confirmed the practice of fabricating denial letters and fax confirmation sheets for purposes of audit submission.

41. As a result of the whistleblower complaint and the events uncovered therein, by the end of October 2017 the Debtor disclosed to health plans and regulatory agencies that it had issues with its billing practices and internal controls within the medical management department.

42. As Mason confirmed to Adventist Health Plan, Aetna, Anthem Blue Cross, Blue Shield Care 1st Health Plan, Brand New Day, Central Health Plan, Cigna, LA Care, Health Net, Humana, Inland Empire Health Plan, and Molina on October 30, 2017:

> Regretfully, I am writing to inform you that I have discovered a breakdown in internal controls within SynerMed's Medical Management Department. Specifically, I learned that the Notice of Action Team (the "NOA Team"), a group within the Medical Management Department that handles the production and mailing of denial letters to Medicare, Medi-Cal and Commercial members, was engaged in the practice of improperly dating denial letters and creating denial letter files.

43. At that time, Health Net advised the Debtor's clients to seek a new MSO and Alpha Care terminated the Debtor's contract 120 days from October 31, 2017. Additional contract terminations were provided to the Debtor shortly thereafter, and thus, the Debtor had no meaningful ongoing income sources as early as October 2017.

44. At this time, the SynerMed board comprised of the following individuals: Edwards, Wong, Li, Mason, Dr. Stephen Kwan, and Carl Moy ("Moy"). On information and belief, Lisa Fok ("Fok") was the board liaison for PAMC Ltd. On information and belief, Fok was an employee of PAMC Ltd. and/or PAMC Inc., not SynerMed.

45. By November 2017, following the disclosures, health plans managed by the Debtor and regulatory agencies began investigating the Debtor, subjecting it to unannounced audits, and by the end of 2017, the medical groups that did business with SynerMed began terminating their service contracts with the Debtor, resulting in a sudden decrease of the Debtor's revenue.

46. Given this sudden decrease in revenue and business operations, the SynerMed board discussed potential avenues for saving the company, including potentially a sale of the business of Conifer Health Solutions, and on November 7, 2017, the Debtor's board of directors sent a letter to each of its clients advising that the business was in the process of trying to transition to a new MSO.

47. By November 9, 2017, the Debtor had approved the sending of WARN Act notices to all of its employees on November 15, 2017, and yet, just one month later, on December 13, 2017, the Debtor's board of directors authorized the payment of retention bonuses in the amount of $3,394,220.

48. By November 17, 2017, the Debtor received a Corrective Action Plan from the Department of Health Care Services ("DHCS"), which identified the "Problem Presented" as follows:

> Recently, the Department of Health Care Services (DHCS) received a whistleblower complaint documenting widespread deficiencies in SynerMed's utilization management (UM) processes. Many Medi-Cal Managed Care Health Plans (MCPs), including the MCPs to whom this letter is addressed, have delegated UM functions to Medical Groups (MG) and Independent Provider Associations (IPA), who in turn have delegated UM functions to SynerMed. Members are currently in imminent danger of not receiving medically necessary health care services because SynerMed is not timely processing requests for health care services.

49. As framed by the DHCS:

> The information DHCS has received to date from the whistleblower and health plans shows that SynerMed:

- Fails to process, or timely process, hundreds, possibly thousands of requests for health care services;
- Fails to provide members and providers with critical Notices of Actions (NOAs) advising them of their appeal rights;
- Falsifies adjudication dates relating to denials, referrals, and modifications; and
- Creates false UM documentation for audit purposes

50. By the beginning of December 2017, the Debtor had retained McDermott to assist in its wind down and sale. Specifically, McDermott was retained to jointly represent the Debtor, the board of PAMC Ltd, and PAMC Ltd in the sale and/or wind down of the Debtor. During this period, McDermott also took on the representation of the Debtor with respect to the government investigations and whistleblower complaints and had actual notice of the Debtor's predicament. To the extent that Debtor could not pay McDermott, PAMC Ltd. guaranteed payment.

51. Based on the limited files produced by McDermott to date, McDermott continuously represented the Debtor (and never provided the Debtor with any letter terminating its representation) with respect to the Debtor's wind down, which was not complete until the Debtor filed for bankruptcy.

52. Indeed, after taking on this joint representation and notwithstanding SynerMed's subsequent sale of all of its assets, McDermott took on additional representations of SynerMed relating to various governmental investigations.

53. The joint engagement agreement purported to waive any potential conflicts of interest between the joint clients, but as discussed below, such purported waiver was ineffective.

54. By December 7, 2017, the SynerMed board determined that the Debtor should continue as an MSO until the end of February 2018, ostensibly to oversee the runoff from the cancelled contracts and to transition clients to new MSOs. Days later, in a transition update, Edward noted that SynerMed would remain open through March 2018 to oversee the transition efforts.

55. As of December 11, 2017, the Debtor was aware of a wrongful termination lawsuit relating to thirty-three employees that had been laid off.

56. On December 11, 2017, PAMC Inc., through PAMC Ltd., changed the Debtor's By-Laws to decrease the minimum number of board members from five to three. That same day, Dr.

Stephen Kwan resigned from the board of directors. Previously, on November 20, 2017, Moy requested to resign as a board member and Edwards took his place as the Secretary of SynerMed.

57. On December 13, 2017, and notwithstanding the ongoing investigations and the wind down of the Debtor, the Debtor's board approved $3,394,220 in discretionary bonuses to officers of the Debtor.

58. On December 22, 2017, Employee Health Systems Medical Group, Inc.("EHS"), one of the Debtor's IPA clients—sued the Debtor for breach of contract, fraud, breach of fiduciary duty and other claims. Subsequently, post-APA, the Debtor defaulted, and judgment was entered in favor of the plaintiff and against SynerMed for damages totaling $227,395,560 (the "EHS Judgment").

59. On January 12, 2018, McDermott ordered a copy of the EHS complaint and received said complaint on January 16, 2018. Notwithstanding the fact that McDermott was SynerMed's counsel relating to its sale and wind down (among other representations), it never advised SynerMed to answer the complaint. Notably, and notwithstanding SynerMed and McDermott's knowledge of the EHS complaint and McDermott's representation of SynerMed with respect to its sale, this complaint was never identified as a liability in the not-as-of-yet executed APA.

60. Thus, by the end of December 2017, the Debtor had lost (or was in the process of losing) all of its business, was the subject of an ongoing government investigation into its practices (including those alleged by the whistleblower), had provided WARN act notices to all of its employees, and was now facing significant third-party lawsuits relating thereto.

61. On January 12, 2018, Rodriguez forwarded a second whistleblower's report to SynerMed's counsel. That report with supporting evidence detailed SynerMed's efforts to prevent referrals to specialty providers based solely on cost.

62. The whistleblower complaint singled out Mason, who it was alleged had complete and total executive control over EHS and SynerMed insofar as EHS delegated operational control to SynerMed.

63. With this alleged control, Mason issued an email with five objectives to control specialty costs. The initiation of a plan to make decisions based on the "high cost" of care was

identified by the whistleblower as “strictly prohibited under California Health & Safety Code Section 1367.02 ‘Economic Profiling.’ ”.

64. To control referrals to specialists, Mason required approval from senior management, which in layman’s terms meant approval from Mason, as alleged by the whistleblower.

65. At all relevant times, McDermott was aware of the whistleblower complaint and the lawsuit by EHS.

**C. The Sale and Transfer of the Debtor’s Assets to a Debt Collection Company, Annex, Without Due Diligence**

66. On January 8, 2018, Cheng forwarded to Fok at PAMC what purported to be version 2 of a draft APA whereby SynerMed’s assets were to be sold for a *de minimis* amount and transferred to a debt collection company, Annex. Documents produced to date by PAMC entities do not reflect that Fok forwarded this document to anyone.

67. On January 10, 2018, Cheng forwarded a version 3 draft of the APA to Fok with the request that she forward the draft to Edwards, Li and Wong.

68. Fok forwarded the version 3 draft APA to Li and Wong on January 10, 2018. Fok’s e-mail does not identify Edwards as a recipient.

69. On January 16, 2018, Wong caused Fok to e-mail a revised version of the APA back to Cheng. The cover e-mail indicated an attachment described as “Asset Purchase Agreement – MWE.pdf” and the attachment itself contained a “DM_US” footer, which on information and belief was used by PAMC Inc.’s and/or PAMC Ltd.’s counsel.

70. Notwithstanding the fact that the attachment and the footer on the attachment appears to reflect the involvement of McDermott (*i.e.,* “MWE” in the document footer), McDermott has refused to provide any communications from or to it relating to the draft APA claiming that any such communications were between it and PAMC Ltd or PAMC Ltd’s board to the exclusion of SynerMed.

71. McDermott’s position cannot be reconciled with its joint engagement agreement that made clear that there was no expectation of confidentiality between PAMC Ltd., PAMC Ltd.’s board, and SynerMed with respect to the proposed sale or wind down of SynerMed and that

SynerMed would be entitled to any communications had between McDermott and the other jointly represented parties.

72. The absence of any e-mail, draft or billing entry by counsel for SynerMed prior to the entry of the APA relating to any receipt, review or editing of the APA (*i.e.*, between January 10 and January 16) reflects either that (i) counsel for SynerMed was not involved in the review and editing process or that the documents have been withheld from turnover, which is more likely based upon the McDermott draft forwarded by SynerMed to Annex (ii) if counsel provided advice, it did so solely for the benefit of PAMC Inc. and PAMC Ltd., not SynerMed, billed PAMC Inc. and/or PAMC Ltd., not SynerMed, and communicated with PAMC Inc. and/or PAMC Ltd., not SynerMed in a patent breach of McDermott's fiduciary duty of loyalty to SynerMed from the outset of the representation.

73. In point of fact, the joint engagement agreement provided by McDermott to SynerMed, PAMC Ltd. and PAMC Ltd.'s board purports to waive current and future conflicts, but fails under the governing standing to make the required full written disclosure of said conflicts or any conflict for that matter. Further, the engagement agreement waiver is signed by Edwards on behalf of SynerMed even though Edwards himself had a conflict, as he was also an officer of PAMC Ltd. At no time did McDermott advise SynerMed in writing that it was engaging in privileged communications with PAMC and/or PAMC's board as against SynerMed prior to or after the APA was entered.

74. Notwithstanding the indication that McDermott reviewed the draft APA, the billing records and production by McDermott for SynerMed do not contain a copy of this (or any other) APA draft, any e-mails to or from the Directors and McDermott relaying any draft version of the APA, or any indication that SynerMed's counsel, McDermott, performed any work on the APA prior to its execution. Again, that McDermott performed and billed for work relating to the draft APA and in providing advice appears self-evident (including from the draft APA containing MWE's edits), McDermott has refused to produce these communications or its work product to the Trustee notwithstanding the fact that the Trustee controls SynerMed's privileges and is entitled to these communications and work product, as reaffirmed in the operative engagement agreement.

75. Thus, it is clear that at all relevant times prior to the execution of the APA, McDermott was fully aware of the terms of the APA, including the sale and transfer of all assets and liabilities, inclusive of all personal health information ("PHI") then in SynerMed's possession to Annex, a debt collection company. For the avoidance of doubt, the PHI was not being provided to the debt collector as an agent of SynerMed for the purpose of securing monies owed; rather, this data was sold to Annex, a third party who had no agency agreement with SynerMed at the time (nor would it need one for an arms-length transaction).

76. On information and belief and based upon McDermott's assertion of privilege as against SynerMed, McDermott never represented SynerMed's interests but rather was governed by what was in the best interest of PAMC Ltd and its board and was disloyal to SynerMed from the outset notwithstanding the joint engagement. The Trustee believes that McDermott has and continues to withhold a trove of communications with PAMC Ltd. and PAMC Ltd's board regarding the APA and SynerMed's sale and wind down that are not privileged as to SynerMed and that will evidence further McDermott's breach of the duty of loyalty owed to SynerMed as well as its efforts to aid and abet PAMC Ltd. and its board in the context of the SynerMed APA and wind down to the benefit of PAMC and its board and to the detriment of SynerMed.

77. McDermott never explained to SynerMed in writing the fundamental distinction between an APA, where SynerMed continued to exist and continued to remain liable for all of its pre-APA liabilities and a bankruptcy and/or assignment for the benefit of creditors (an "ABC").

78. On January 17, 2018, the Debtor held a meeting of its Board of Directors—Edwards, Wong, and Li. Lisa Fok, and Cheng were also present at the meeting. At the January 17, 2018 meeting, Cheng presented the APA between the Debtor and defendant Annex, a debt collection company, for consideration.

79. To date, neither the Directors, the PAMC Ltd. Board, McDermott, nor any other person has turned over any e-mails pre-dating the January 17, 2018 Board meeting in which the APA was discussed, analyzed, or reviewed other than the circulation of drafts of the APA from Cheng to Fok to Wong and Li and back to Cheng as alleged herein above.

80. For his part, Mr. Edwards asserted in the relevant board minutes that he was not in favor of the APA because he "was unfamiliar with the negative ramification" of the APA.

81. The original draft APA and the final version of the APA are riddled with typographical errors and contain undefined terms as to key issues, provided that all of the Debtor's assets would be assigned to Annex (which the Debtor later claimed exceeded $21 million), and that Annex would assume all of the Debtor's liabilities, in exchange for a payment of $250,000.00. There was no list or identification of specifically what assets or liabilities were transferred to Annex. As an example, the APA contains the term "Assigned Contracts," but the term is undefined. Moreover, to the extent that the Debtor's contracts required consent from contracting parties to any assignment thereof, there is no evidence that the Debtor's management sought or obtained such consents. Further, to the extent that Annex was required to have certain licenses to perform the duties previously performed by the Debtor, there is no evidence that Annex possessed or obtained such licenses.

82. To the extent that McDermott reviewed the APA before it was executed, and there is evidence that it did so, it failed to notify SynerMed prior to the APA's execution of the myriad of material issues with the APA, including SynerMed's continued exposure to liabilities.

83. To the contrary, on information and belief the APA was a sham transaction entered into with an unqualified buyer for inadequate consideration in order to allow SynerMed and PAMC to shed all of SynerMed's assets making SynerMed judgment proof, thus dissuading the government, whistleblowers and creditors from proceeding against SynerMed. Stated another way, the APA served no legitimate purpose and no legitimate purpose has ever been identified by anyone involved in the transaction. It appears to have been entered into solely with the actual intent to hinder, delay, and defraud creditors of the Debtor. Among other things, the government may have a claim against the Debtor and others for this transfer conducted at a time when whistleblower complaints were pending.

**D. There Are Different Signed Versions of the APA With Different Material Terms**

84. Not only does the APA have issues with undefined terms, there are at least two versions of the APA in existence. As part of the Trustee's request for turnover of books and records,

SynerMed's board turned over an APA stating that "[a]ll employees and executive will be terminated effective January 15, 2018." APA, at Section 2.9(b). This version of the APA also provided that the buyer would assume all obligations owed to SynerMed's employees. *Id.*, at Section 4.5.

85. However, SynerMed's outside accountants and independent auditors, BDO (which firm is also PAMC Ltd.'s accountant and issues a consolidated financial statement for PAMC Ltd.), turned over an amended version of the APA initialed by Edwards (the "Amended APA", attached hereto as Exhibit 2). This version, which contained the same signature page and effective date as the Board's version of the APA, purported to eliminate Section 2.9(a) and (b) and 4.5 regarding termination of employees and Annex's assumption of such employee obligations. These edits appear to have been approved by Edwards (notwithstanding the fact that he did not turn over to the Trustee a version with these changes) after he executed the APA and, thus, the Amended APA, not the APA, was treated by Edwards as the operative document.

86. The Amended APA was not in the documents turned over by SynerMed or McDermott, and Edwards, who initialed the Amended APA, testified that he did not recall this version even though he signed off on SynerMed's tax return for 2018. The tax return, which was not prepared until 2019, was based upon the Amended APA and SynerMed's retention of employee liabilities. On January 19, 2018, Edwards caused Fok to e-mail the Amended APA version to Cheng for the first time. There were no documents turned over by SynerMed's counsel, SynerMed or either PAMC entity discussing the edits made to the APA by Edwards reflected in the Amended APA. There are no board minutes, notes or e-mails evidencing approval of the edits to the APA made by Edwards in the Amended APA. The Amended APA version was turned over solely by BDO and, subsequently, the PAMC entities, but not from SynerMed or its counsel.

87. In the Amended APA, SynerMed retained substantial employee liabilities (and there were currently pending and threatened litigation, as well as promises of substantial bonuses) notwithstanding the fact that SynerMed purported to transfer all of its assets to Annex and did not retain any cash or other assets to meet these employee obligations (and received no consideration for this amendment to the APA). To date, SynerMed's Board has not turned over documents or

provided information explaining the existence of the two versions of the APA containing different material terms, the APA and Amended APA, although PAMC Ltd. turned over documents relating thereto.

88. With respect to the undefined "Assumed Contracts" in either the APA or Amended APA, there is no evidence that (a) a listing of such contracts was ever prepared or (b) that the parties to those contracts were advised of the APA and/or Amened APA and consented to the assignment from SynerMed to Annex. Accordingly, SynerMed remained a party to these contracts and subject to suit notwithstanding the APA and/or Amended APA.

**E. At All Times PAMC Ltd, the PAMC Ltd. Board and McDermott Acted in the Best Interests of PAMC Ltd., not SynerMed and None Performed any Due Diligence on behalf of SynerMed Prior to the Execution of the APA**

89. At all times in approving the APA, the Directors of the Debtor acted in the best interests of PAMC Ltd. and PAMC Inc., as did SynerMed's counsel, McDermott, and not the Debtor's best interests, by stating that they decided to sell and transfer all the assets of the Debtor to Annex because it was in the best interests of PAMC Ltd.

90. Summarizing the January 17, 2018 board meeting wherein the APA was approved, the original draft of the board minutes provided as follows:

> Dr. Wong began the meeting by stating that he had talked to some non-board shareholders and to some limited partners of PAMC, Ltd. who felt an asset purchase of SynerMed was the best way to go. ***If it's in the best interest of PAMC, Ltd., therefore, it's the best interest for SynerMed to pursue the Asset Purchase Agreement***.
>
> Mr. Takashi Cheng presented the attached Asset Purchase Agreement (APA) with Annex Financials. Dr. Wong handed the APA to Mr. Edwards last week to review.
>
> Mr. Cheng left the room. The Board Members reviewed the pros and cons of the APA with legal counsel over the weekend. The APA will be similar but sooner than the inevitable Bankruptcy. A friendly liquidator is better than an unknown receiver. Mr. Edwards felt it was too fast and was unfamiliar with the potential negative ramifications. Mr. Edwards was concerned of the effect on the SynerMed employees. The Board voted to accept the APA effective January 19, 2018. All were in favor with the exception of Mr. Edwards. Mr. Edwards was

instructed to execute the Asset Purchase Agreement. Mr. Cheng was invited back and the APA was executed.

91. Specifically, on January 17, 2018, the Directors discussed the APA, and they discussed the alleged advice received from legal counsel regarding the APA, which stated: **"_______[redacted for privilege, will file under seal]_____________."**

92. However, a receivership or an ABC are well-established statutory avenues used as alternatives to a bankruptcy filing. An asset purchase agreement or sale and transfer of assets and liabilities is not a statutory avenue or vehicle to liquidate and collect assets for the benefit of creditors.

93. The APA with what was described by counsel as a **"___[redacted for privilege, will file under seal]__"** did not provide for the liquidation and collection of SynerMed's assets for the benefit of creditors nor adherence to any of the statutory protections afforded to creditors.

94. Whereas an ABC is governed by Section 493.010 to 493.060 and 1800 to 1802 of the California Code of Civil Procedure and a receivership is governed by court orders, the sale and assignment of assets and liabilities is not governed by statute or court orders. Among other things, an assignment pursuant to an ABC would have required that notification be made to all of SynerMed's creditors, equityholders and other parties in interest within thirty (30) days of the acceptance of the assignment. No such procedures were implemented here by way of the APA and/or Amended APA and no notice of the APA or the Amended APA was provided to creditors. Rather, this was a rushed transaction done without due diligence or appropriate due diligence, and was done without notice to SynerMed's creditors.

95. The Debtor's files contain no evidence of any advice actually obtained from McDermott relating to the bona fides of the APA transaction prior to its consummation, let alone the consideration of this transaction as compared with a bankruptcy, receivership or an ABC. The Debtor did not turn over any analysis from McDermott and McDermott's own records reflect that they did not first review the APA, at least on behalf of SynerMed, until after the January 17, 2018 board meeting when the APA was approved. The board minutes also reflect that McDermott did not attend or participate in the board meeting wherein the APA was approved. Nevertheless,

McDermott has made it clear that it did review the APA for the benefit of PAMC Ltd. and its board but has refused to produce any such review or communications thereon.

96. Notwithstanding the evidence that McDermott edited the draft APA, its billing records to SynerMed reflect that the APA was first forwarded to McDermott on January 17, 2018 and counsel was specifically asked who would be responsible for certain severance payments. On January 18, 2018, McDermott created a draft response to Wong, which draft analysis **"___[redacted for privilege, will file under seal__."**

97. Thus, it appears that McDermott has hidden work it did on the APA from the Trustee by means of billing PAMC, not SynerMed, and by communicating with PAMC and withholding said communications from SynerMed notwithstanding the joint representation and the Trustee's right to said communications.

98. The analysis provided by SynerMed's counsel to Wong on January 18, 2018 regarding the APA addressed only **___[redacted for privilege, will file under seal]__.**

99. Further, although the board minutes suggested that the Board reviewed the pros and cons of "the APA with legal counsel over the weekend" (which would have been January 13-14, 2018 given that January 17, 2018 was a Wednesday), McDermott's time records pertaining to its representation of SynerMed reflect that no such discussions took place at that time. Neither counsel nor PAMC Ltd. have turned over McDermott's billing records with respect to work performed by counsel for PAMC Ltd. or PAMC Inc. on the APA notwithstanding that this was a joint engagement. The billing records for SynerMed's counsel further reflect that they did not receive a copy of the APA until January 17, 2018 and the version they received had already been executed by Edwards.

100. In connection with his investigation of the Debtor's business and financial affairs, the Trustee requested that McDermott and PAMC Ltd.'s board turn over all documents relating to SynerMed representations, including joint representations given that those communications are not confidential as to SynerMed and the Trustee holds SynerMed's privileges. The Trustee also requested all files sold to and/or transferred to Annex, which files admittedly would have included PHI. While McDermott acknowledged the existence of communications and work product, McDermott has refused to produce these documents. McDermott has not responded to the request

for the turnover of SynerMed's data files. Based on the documents turned over to the Trustee, there did not appear to be any e-mail from anyone at SynerMed to McDermott forwarding the APA prior to the January 17, 2018 board meeting. McDermott identified only receiving an executed version of the APA.

101. By their own admission in the limited production made by McDermott to date, McDermott on behalf of SynerMed did not complete a more in-depth review of the APA (not the Amended APA insofar as that version does not appear in counsel's SynerMed file) until January 28, 2018, over one week after the agreement had officially taken effect. **___[redacted for privilege, will file under seal]__.**

102. The e-mails do not explain how McDermott first became aware of the inconsistencies after the execution of the APA given that at least one document produced reflects that McDermott was involved in the drafting process.

103. Nevertheless, McDermott's SynerMed records reflect that it was reviewing the executed APA, not the Amended APA, as McDermott made no mention of the fact that SynerMed agreed to retain all employee liabilities and the only version of the agreement produced by counsel is of the APA, not the Amended APA. McDermott also failed to point out the absence of a definition for "Assumed Contracts." Nevertheless, McDermott provided no advice as to the already executed APA, except with respect to the control of business records post-APA given the ongoing DMHC investigation. McDermott provided no advice regarding the bona fides of the APA as a legitimate business transaction in the best interest of SynerMed, its shareholders and, given SynerMed's insolvency, SynerMed's creditors.

104. In point of fact, SynerMed's own general counsel claimed to be blindsided by the APA and so advised Edwards and Cheng after she became aware of the sale a day later on January 18, 2018. As Rodgriguez advised Edwards and others:

> On Thursday, 1/18 in the evening, John Edwards informed me of SynerMed's sale to Annex Financial and of the termination of all SynerMed employees (including me) effective Friday, 1/19. He and I had several conversations between Friday, 1/19 and Tuesday, 1/23, where we discussed the transaction and my specific termination. Takashi, Mike and I spoke on Tuesday, 1/23, and I expressed serious legal and ethical concerns about the transaction (concerns that were

> underscored by Takashi' s statement to Mike and me that you ‘gut companies and get rid of employees’ - ***a practice that is very troublesome given the fact that SynerMed is involved in patient care and has 300+ employees***). Takashi, you said that you were going to speak with John about delaying the closing of the transaction until 3/13 (the end of SynerMed's WARN notice period previously communicated to employees) and that you would have the SynerMed Board confirm, in a written notice from them to me, that I remain an employee of SynerMed. To date, I have received no such confirmation from John or anyone else on the SynerMed Board. As such, I am not employed by SynerMed and I have no obligation or duty to Annex. Moreover, I understand that the transaction has not been unwound or delayed and that Annex has assumed all of SynerMed’s assets and liabilities (including its employee liabilities).

### F. SynerMed’s Business Records Were Altered After Receiving a Subpoena from the DMHC

105. On January 26, 2018, counsel for SynerMed received a subpoena from the DMHC.

106. In the subpoena, the DMHC specifically requested “ALL minutes of meetings of the SYNERMED Board of Directors from July 1, 2017, through the date of production under this Subpoena.” Further, the DMHC subpoena was focused in large measure on the sale of SynerMed’s assets.

107. On or before this date, SynerMed (or PAMC Ltd. acting on SynerMed’s behalf) engaged McDermott to represent it in SynerMed’s response to the DMHC subpoena.

108. On January 26, 2018, McDermott provided a copy of the DMHC subpoena to Edwards at his PAMC e-mail address and, further, asked **___[redacted for privilege, will file under seal]__.**

109. On January 31, 2018, Fok forwarded the January 17, 2018 minutes to McDermott advising McDermott **___[redacted for privilege, will file under seal]__.**

110. On February 2, 2018, McDermott and Edwards engaged in discussions to **__[redacted for privilege, will file under seal__.**

111. In an attempt to suggest **__[redacted for privilege, will file under seal__.**

112. On information and belief, **__[redacted for privilege, will file under seal__.**

113. At the time of the communications between Edwards and McDermott regarding the minutes, both McDermott and Edwards were aware and in possession of the DMHC subpoena seeking said minutes.

114. Subsequent to receiving the subpoena, the minutes read as follows:

> Dr. Wong began the meeting by stating that he had talked to some non-board shareholders and to some limited partners of PAMC, Ltd. who felt an asset purchase of SynerMed was the best way to go. Dr. Wong also expressed the view that, with respect to the proposed Asset Sale Agreement, the interests of SynerMed and PAMC, Ltd. are aligned.
>
> Mr. Takashi Cheng presented the attached Asset Purchase Agreement (APA) with Annex Financials. Dr. Wong handed the APA to Mr. Edwards last week to review.
>
> Mr. Cheng left the room. The Board Members then discussed advice received from legal counsel. That discussion is contained in the attorney-client privileged Attachment A. Mr. Edwards felt it was too fast and was unfamiliar with the potential negative ramifications. Mr. Edwards was concerned of the effect on the SynerMed employees. The Board voted to accept the APA effective January 19, 2018. All were in favor with the exception of Mr. Edwards. Mr. Edwards was instructed to execute the Asset Purchase Agreement. Mr. Cheng was invited back and the APA was executed.

115. On February 5, 2018, Fok sent to McDermott a copy of all 2017 and the January 2018 board minutes. The version of the January 17, 2018 minutes was the one that had been revised after receipt of the subpoena. On information and belief, to the extent the DMHC was provided with the January 2018 board minutes pursuant to the subpoena, DMHC would have been provided the altered minutes and not the minutes as originally drafted by SynerMed's board.

116. As the revised minutes continued to state, Wong and Li voted in favor of the APA and Edwards voted against, stating that he felt it was too fast and that he was unfamiliar with the potential negative ramifications of the APA. Indeed, it does not appear that the SynerMed Board received advice from anyone (other than unidentified PAMC Ltd. owners) regarding the transaction or that Wong and/or Li, who voted in favor of the APA, had any understanding as to its ramifications.

117. The altered board minutes provide the appearance of a transaction founded upon advice of counsel (which advice could then be shielded from the DMHC) and not driven by PAMC Ltd.'s interests. However, neither SynerMed nor McDermott have turned over any documents showing that such advice was sought or provided prior to SynerMed entering into the APA. McDermott has refused to produce such advice claiming that it only provided advice to PAMC Ltd., not SynerMed, notwithstanding the joint engagement agreement. Moreover, McDermott, PAMC Ltd. and SynerMed's Board removed the actual advice, which was spelled out in the original minutes and that reflected that no legitimate advice was given. Thus, the altered board minutes gave the appearance that the APA was predicated on sound advice of counsel when the truth of the matter was an absence of such advice.

118. As Edwards made clear in the board minutes and subsequent testimony, the APA was a "fire sale" and Edwards had not even read the entirety of the APA at the time he executed it on behalf of SynerMed. He was not aware as to the potential ramifications of the APA and had not conducted any due diligence as to the transaction or appropriate due diligence as to Annex. While Edwards later testified that counsel put the APA in front of him for his signature, the board minutes for the meeting in which the APA was executed do not identify any counsel being present at the meeting. No one analyzed the value of the assets and/or liabilities being transferred.

119. McDermott did not advise the Debtor as to the merits of the actual structure of the transaction, its potential negative ramifications, its legality, the inconsistencies or flaws in the APA as drafted, or whether or if Annex could stand in the shoes of SynerMed in the performance of SynerMed's contractual obligations.

120. No board minutes discussing whether or if to execute the Amended APA, let alone any analysis thereof, was turned over by SynerMed, PAMC Ltd, PAMC Inc. or McDermott.

121. The minutes themselves are contradictory. On the one hand, the minutes state that the APA was presented at the meeting; on the other hand, the minutes state that the APA was provided to Mr. Edwards the week before. No documents were provided by Edwards or anyone at SynerMed reflecting any due diligence performed thereon by the Directors after receipt of a draft from Cheng. While Wong caused an edited version to be sent back to Cheng, there are no e-mails or billing

records explaining who edited the draft APA for SynerMed (or PAMC) and for what purpose, let alone whether and why an APA with a debt collection company was in SynerMed or it's creditors' best interests at a time when SynerMed was subject to an ongoing DMHC investigation and lawsuits threatened, pending and ongoing, as well as seeking to run-off and transition its business given that Annex was not a qualified MSO.

**G. PAMC Ltd., the PAMC Ltd. Board, the Directors, and McDermott Conducted No Due Diligence as to the Propriety of Selling SynerMed's Assets to a Debt Collector and then Proceeded to Transfer PHI in Violation of HIPAA and Patients' Privacy Rights and Unquantified Assets to Annex**

122. The Trustee is informed and believes, and based thereon alleges, that Annex, a debt collection company, was not a qualified MSO and could not perform work using any of SynerMed's licenses. The Trustee is further informed and believes, and based thereon alleges, that there is no evidence that any existing contracts allegedly assumed were identified or that such contracts were properly assigned with notice and consent obtained from the other contracting parties, which would serve to sever SynerMed's obligations thereon.

123. There were no documents turned over by PAMC Ltd, PAMC Inc., the Directors or McDermott evidencing that anyone investigated the propriety of selling SynerMed's assets, which included hundreds of thousands of patient records to Annex, a debt collection company. Nor, as discussed below, did PAMC Ltd., the Directors or McDermott consider (i) whether SynerMed could simply sell and transfer patient records without maintaining copies of same as required by law or (ii) how SynerMed if it did transfer patient records without keeping a copy it could then access and use those documents in response to governmental subpoenas or lawsuits.

124. Further, as part of the close of the transaction, SynerMed sent approximately eight terabytes of data to Annex, which data included PHI. To be clear, Annex was not SynerMed's agent, had not entered into any Business Associate Agreement, assuming such an agreement would be appropriate for a sale of assets, and was not a licensed MSO at the time SynerMed sold and transferred PHI that, on information and belief, included hundreds of thousands of patients and their personal data.

125. That SynerMed sold this data to Annex is borne out in e-mails between McDermott and Edwards, as well as communications with Cheng. For, after SynerMed became the subject to multiple investigations, McDermott was required to negotiate with Annex for access to the data that had been transferred to Annex as part of the sale.

126. As McDermott memorialized in a March 8, 2018 e-mail to Edwards:

**[redacted for privilege, will file under seal]**

127. In these e-mails between McDermott and SynerMed, the parties identified the "eight TB" sold and transferred to Annex.

128. In subsequent communications between McDermott and government officials, McDermott repeatedly advised that their "business records and electronic databases" were in possession of a third party, including the fact that "that "we are and have been reliant on third parties in connection with the process of gathering materials responsive to the various subpoenas and do not have visibility into the full process associated with that document gathering thereof."

129. When McDermott ultimately received the documents from Annex (or access thereto), McDermott acknowledged that the documents in Annex's possession, which were then produced to various governmental agencies, "contains PHI."

130. To date the information regarding the claims handled by SynerMed as an MSO, including all patient records as of the date of the APA and which were sold and transferred to Annex, have not been turned over to the Trustee notwithstanding the fact that SynerMed had an affirmative obligation to maintain these records.

131. Based upon communications between Mr. Edwards and Mr. Cheng beginning on January 19, 2018, there were "hundreds of thousands of Authorizations not completed." It is the Trustee's position based on his due diligence to date that there may be a substantial class of unscheduled claims based upon state privacy law claims belonging to persons whose private health information was provided to SynerMed and then sold to Annex (among other unscheduled claims). Notably, there is no evidence that SynerMed ever notified any of the individuals whose PHI was sold and transferred of said event and the names and information relating thereto has not been turned over to the Trustee. The Department of Health and Human Services may, likewise, have claims for

HIPAA violations, which range from $141 to $2,134,831 per violation. The Trustee reserves its right to seek damages and recover on account of these unscheduled claims once Defendants turn over the patient data which they have refused to provide to the Trustee to date.

132. It does not appear that SynerMed, PAMC or McDermott (nor Annex) ever provided timely notice (or any notice) to patients administered by SynerMed that there medical information was sold to a debt collector (Annex), or that the proper disclosures were made to HHS. The Trustee continues to investigate these issues, which investigation has been hampered by SynerMed, PAMC Ltd., PAMC Inc., McDermott, Annex and Achievamed's failure to turn these documents over.

133. Notably, and notwithstanding SynerMed's obligation to maintain a copy of these records, McDermott and PAMC repeatedly admitted that SynerMed did not do so but simply turned all of their records, including patient records containing PHI, to Annex at a time when Annex was not a licensed MSO and without any recourse in the event Annex used this information or sold this information.

134. Further, McDermott's billing records to SynerMed reflect that McDermott analyzed wind down issues at the request of Wong on February 2 and 6, 2018, and that counsel sent Wong correspondence regarding the same. But, no such correspondence, including that with respect to counsel's "[f]inalizing wind down advice for Dr. Wong" appears to have been turned over to the Trustee by counsel or the Directors.

135. At the end of February 2018, almost two months after the APA/Amended APA, Cheng circulated a partially executed Business Associate Agreement (between SynerMed and Annex) and Consent and Assignment and Assumption Agreement (purportedly directed at EHS by SynerMed) that were back dated to January 19, 2018. The Business Associate Agreement was designed to address HIPAA (defined below) issues, but a fully executed agreement, to the extent that there is a fully executed agreement, has not been turned over to the Trustee. Further, the unsigned agreement specifically states that the agreement needed to be signed before SynerMed transferred its files to Annex, which did not occur as the files already had been sold and transferred. Notably, the Business Associate Agreement referenced an Administrative Services Agreement between

SynerMed and Annex dated as of October 1, 2016. On information and belief, no such document exists.

136. Likewise, the Consent and Assignment and Assumption Agreement sent to EHS and Annex for their approval in April 2018 was back-dated, not fully executed and was designed to perfect an assignment of the EHS agreement to Annex. Again, this was attempted after the fact and not at the time of the APA. A fully-executed version was not turned over by SynerMed or McDermott to the Trustee.

137. On information and belief, the back-dated Business Associate Agreement was pretextual. Annex was not SynerMed’s agent and was not performing services on SynerMed’s behalf. Rather, pursuant to the APA, SynerMed sold and Annex bought all of SynerMed’s assets, which included SynerMed’s patient records. The after-the-fact papering by means of a not fully executed Business Associate Agreement and Consent form was merely to give the appearance that Annex was performing work on SynerMed’s behalf, which Annex never did. It was also designed to hide the HIPAA and privacy violations by SynerMed when it transferred all of its files to Annex as part of the APA without any such agreement in place or any consent from any of SynerMed’s customers.

138. The Trustee is informed and believes, and based thereon alleges, that there was no due diligence performed by the Debtor, Edwards, Wong, Li, PAMC Ltd., PAMC Ltd.’s Board, PAMC Inc. or McDermott regarding Annex, Annex’s ability to satisfy the liabilities, nor Annex’s ability to manage health plans and patient care that were a part of the Debtor’s business. Later, Edwards would even admit that he had no idea of the value of the assets transferred by SynerMed to Annex or the value of SynerMed’s liabilities assumed by Annex.

139. As Edwards admitted in April 2018 to BDO with respect to the Amended APA, [w]e did not have a list of the assets and liabilities. I am not sure how to access them at this time. Sorry about that.”

140. To that point, BDO’s documents and e-mails between Edwards, Cheng and BDO, reflect that the Directors did not know and could not provide BDO with information regarding the

assets and liabilities transferred. Accordingly, BDO looked to Cheng for that information notwithstanding the fact that Cheng did not work for SynerMed.

141. As to SynerMed's employees, subsequent e-mails, including from Rodriguez, reflect that no one knew who employed SynerMed's employees post-APA. The APA provides that SynerMed would continue to operate the business, while Annex would be responsible for all employee liabilities. Notwithstanding this inconsistency, Edwards was instructed by Wong and Li to sign the APA on behalf of the Debtor. Edwards later testified that he did not read the APA before signing. At least as of January 18, 2018, Edwards believed that SynerMed employees became the financial responsibility of Annex noting in the context of cutting employee termination checks that "[i]t is their company after midnight."

142. The APA is dated January 19, 2018, and Edwards signed on behalf of the Debtor no later than January 17, 2018. Mia Adamson signed the APA on behalf of Annex.

143. On or about January 19, 2018, Edwards made edits to the APA including striking Section 2.9(b) and Section 4.5, creating the Amended APA that Edwards provided to PAMC Ltd.'s and SynerMed's accountants. Thus, days after the APA was executed, Edwards initialed the Amended APA saddling SynerMed with all employee liabilities for no consideration.

144. As Mr. Edwards stated in the Section 341(a) meeting in connection with the Debtor's bankruptcy filing, the only thing that the Debtor knew was that Annex dealt with "distressed assets," yet the Debtor purported to sell all assets and purported to transfer all of its employees to work for the benefit of Annex—although days later SynerMed's agreed to retain all liabilities relating to its employees.

145. The Debtor's Board of Directors—Edwards, Wong, and Li—did not disclose the APA to the Debtor's senior officers before the APA was signed, including the Debtor's Chief Financial Officer (CFO) and general counsel.

146. The APA transaction was described as a "fire sale" by Edwards after the Directors only considered the APA in less than a few days if that.

147. Cheng was the representative of Annex, and he communicated with the Debtor's Directors regarding the sale of all assets to Annex.

148. Although the APA was signed by Mia Adamson on behalf of Annex, on information and belief, the Directors did not meet or speak with Ms. Adamson.

149. After the APA was signed, Annex purportedly took possession of the Debtor's books and records (including those subject to HIPAA regulations), the Debtor's equipment, the Debtor's office space, the Debtor's contracts, the Debtor's assets, and Annex purportedly operated the Debtor's business, doing business as "Synermed" although

150. For example, in June 2018 SynerMed received a litigation hold notice to preserve evidence. Counsel for SynerMed acknowledged at that time that "all of SynerMed's data systems and records" had been transferred to Annex as of January 19, 2018.

151. SynerMed, an MSO, was a covered entity that was subject to and required to follow the Health Insurance Portability and Accountability Act ("HIPAA") regulations. Notwithstanding these regulations, included in those books and records sold and transferred to Annex as part of the APA was patient information subject to HIPAA.

152. In selling and transferring patient information to Annex, as well as ongoing (and undefined contracts), SynerMed conducted no due diligence as to whether such contracts were assignable (including whether such contracts were assignable to a non-MSO) and, further, whether Annex had the requisite safeguards and expertise to comply with HIPAA regulations, including regulations regarding non-disclosure—including whether SynerMed's transfer of such files to Annex violated HIPAA in the first instance. SynerMed conducted no due diligence as to whether it could simply turn over its records to Annex without violating HIPAA requirements.

153. SynerMed was not free to sell and disseminate patient information subject to HIPAA to Annex. At the time of said dissemination by SynerMed, it had not entered into either an Administrative Services Agreement or Business Associate Agreement with Annex, nor was Annex licensed as an MSO or acting as SynerMed's agent and, thus, on information and belief SynerMed sold and transferred all of its files to Annex, including files SynerMed's counsel needed to address the DMHC investigation, and such transfer was a violation of HIPAA regulations and individual patients' privacy rights.

154. SynerMed did not report a HIPAA breach when it transferred protected health information ("PHI") to Annex even though it sold this information to Annex (and transferred said information prior to and without an executed Business Associate Agreement, assuming such an agreement was appropriate under the circumstances) and which unexecuted Business Associate Agreement refers to a non-existent Administrative Services Agreement, nor did it determine that there was a low probability that the PHI had been compromised or would be compromised in Annex's control.

155. As discussed above, the Directors knew that the Debtor and Annex did not enter into a Business Associate Agreement at the time of the APA and at the time the Directors caused the Debtor's records to be transferred to Annex, let alone any consent and assignment agreements. They and McDermott also knew that Annex was not an agent of SynerMed, was not a continuation of SynerMed's business, and had bought these assets. At best, an executed Business Associate Agreement would simply have been pretext to hide the true nature of the transfer of PHI to Annex by SynerMed.

156. As a result of the APA and McDermott's failure to explain the nature of the transaction, Edwards wrongly believed that Annex would operate the Debtor's business as if the Debtor was fully acquired by Annex, even though the APA stated that the Debtor would continue to operate in the ordinary course of its business and pursuant to the Amended APA would still be responsible for its employees and even though counsel advised after the APA that the liabilities still belonged to SynerMed because they were still obligated under the contracts.

157. Notwithstanding the terms of the APA, on January 19, 2018 Cheng wrote to Edwards and Fok, among others, "Annex only purchased the assets, not the employees/company."

158. Cheng then described that there was a "misunderstanding," as he believed that "Annex was only going in today [to] take inventory and control of the assets. Your business was supposed to carry on as usual."

159. At the 341(a) meeting of creditors, Edwards testified that after the APA, there were no longer employees of the Debtor—only the Board of Directors were acting on behalf of the Debtor

notwithstanding the contradictory Amended APA and the fact that SynerMed filed a tax return for 2018 reflecting that it retained liability for the employees.

160. Nevertheless, it does not appear that Annex assumed or took responsibility for any of SynerMed's liabilities, let alone all of them. SynerMed, not Annex, continued to participate in the DMHC investigation. In that regard, SynerMed's counsel had to request access to and documents from Annex to respond to the DMHC. On information and belief PAMC Ltd., not Annex, paid SynerMed's ongoing legal fees.

161. Recognizing the uncertainties associated with whether the liabilities purportedly transferred by SynerMed to Annex pursuant to the APA would insulate SynerMed from liability (including potential litigation with SynerMed former employees that Annex would not cover), SynerMed's counsel recommended to Edwards that SynerMed obtain extended reporting period coverage on its employment liability and employment practices.

162. SynerMed did not seek or receive a novation from any of its contracting parties, such that SynerMed remained contractually-liable under all of its contracts including those assumed, if any, by Annex.

163. Further, Annex sent a memo to SynerMed senior executives on January 23, 2018 that the closing date for Annex's acquisition was now March 13, 2018, which was understood by Michael Caponetto, an executive of SynerMed, to mean that SynerMed's employees remained employees of SynerMed until March 13, 2018. This appears consistent with the Amended APA, although there does not appear to be any consideration provided by Annex to SynerMed for SynerMed's retention of the employee liabilities that were otherwise transferred to Annex pursuant to the APA and many of SynerMed's assets already had been transferred to Annex (including the patient data).

164. Further, there is no evidence that Annex assumed any of the ongoing or contemplated litigations against SynerMed except as disclosed. Specifically, Section 2.3 of the APA states that "[e]xcept as already disclosed to Buyer, there is no pending proceeding, and no person has threatened to commence any proceeding." The APA, however, only disclosed the DMHC

investigation and SynerMed turned over no documents indicating it put Annex on notice of the EHS litigation before the APA was executed even though Edwards and counsel were aware of it.

165. Notwithstanding SynerMed's and its counsel's knowledge of the EHS litigation before SynerMed entered into the APA, the Debtor never answered the complaint and allowed EHS to secure a massive default judgment.

166. At the time that the decision not to have the Debtor answer was made, PAMC Ltd. controlled the Debtor's decisions. PAMC Ltd., not SynerMed (which had no employees), simply forwarded complaints as they came to Annex and then did nothing.

167. Likewise, counsel for SynerMed, which was also counsel for PAMC Ltd. and had been retained by SynerMed to provide advice in winding down SynerMed's operations, was in receipt of the EHS complaint prior to the entry of the APA. Counsel never advised SynerMed that it needed to answer the complaint nor did it advise SynerMed to seek to set aside the subsequent default.

168. To the extent that PAMC Ltd. believed that Annex had assumed the liability for and defense of the EHS litigation, there is no evidence that PAMC Ltd. made a demand to be defended and/or indemnified by Annex with respect thereto and enforced its rights thereto. Rather, PAMC Ltd. simply allowed the default judgment to be entered against SynerMed.

169. To the extent that Annex was in breach of its obligations under the APA, the Trustee is informed and believes and based thereon alleges that SynerMed and/or PAMC Ltd. did not claim such a breach and did not seek to enforce Annex's Amended APA obligations. Even if the Directors believed that Annex had assumed litigation liabilities, that assumption would not have eliminated SynerMed's obligation to answer the complaint filed by EHS or the subsequent complaint filed by Angeles-IPA. SynerMed continued to be a separate entity from Annex, the conveyance of liabilities was not done by way of an ABC, receivership or bankruptcy, and SynerMed, not Annex, was the real party in interest in these lawsuits.

170. As another example, in June 2018 SynerMed was sued by Angeles-IPA for breach of contract and other claims in the total amount of $5,061,200. As in the EHS litigation, SynerMed did not file an answer and Angeles-IPA took SynerMed's default. Judgment was entered in Angeles-

IPA's favor in late-2018 in the amount of $1,536,779.86, although notice of the entry of judgment was not served until December 13, 2019.

171. The Directors, PAMC Ltd. and SynerMed's counsel were aware of the Angeles-IPA and failed to take any action to timely answer the complaint or set aside the default. At all times, the Directors and counsel's loyalty lay solely with PAMC Inc. and PAMC Ltd. Counsel did not advise SynerMed to answer the complaint or, later, to seek to set aside the default.

172. According to the Debtor's 2018 federal tax return, the Debtor claimed to have transferred $21,905,209.00 in assets to Annex as a result of the Amended APA.

173. However, at all relevant times, neither the Directors not PAMC Ltd. analyzed or took into account the value of the Debtor's assets being transferred to Annex nor the value of liabilities being assumed, as reflected in communications with BDO and testimony from Edwards. They simply conducted no analysis. They had no basis to determine whether a payment of $250,000 to SynerMed in return for a payment of almost $22 million in cash and other assets to Annex (and an additional transfer by SynerMed to Annex of $1,870,257.88 in tax refunds that belonged to SynerMed if it belonged to anyone) was adequate consideration especially given the fact that SynerMed was still directly liable for all of its allegedly transferred liabilities including, most notably, millions of dollars in employee obligations.

**H. The Debtor's Insolvency Prior to the APA**

174. The Trustee is informed and believes, and based thereon alleges, that the Directors and PAMC Ltd. knew that the Debtor was insolvent as a result of the events in 2017, which caused the Debtor's clients to give notices of termination and SynerMed to provide WARN notices. The loss of business (and decision to end operations) coupled with both pending lawsuits and government investigations and anticipated lawsuits, the Directors and PAMC Ltd. knew that the Debtor's liabilities exceeded its assets and that a bankruptcy was "inevitable."

175. Even Annex documented to both BDO and SynerMed that SynerMed was hopelessly insolvent in 2017 as a result of the crisis caused by the issues uncovered in the audit, the resulting whistleblower reports, the investigations and the termination of contracts with SynerMed. As Cheng wrote to SynerMed in mid-2018:



2995324_2

> However, SynerMed instantly lost its major clients when the crisis occurred, and consequently the CEO made official announcements of closing business in November 2017. As a result, SynerMed was not a going concern any more from November 2017, and its assets such as A/R, prepaid expenses, and fixed assets were significantly impaired.

176. Indicative of the Debtor's inability to pay debts or continue operations, on information and belief its counsel's bills (and other fees and costs) were being paid by PAMC Inc. and/or PAMC Ltd. and not the Debtor, as were others on behalf of the Debtor. As one example, after the Amended APA was entered into SynerMed purported to retain Greenberg Gross LLP to represent Dr. Jorge Weingarten in the DMHC investigation. SynerMed, not Annex, agreed to pay for this defense (notwithstanding the fact that SynerMed had no assets) and PAMC Ltd. agreed that PAMC Inc. would ensure payment if SynerMed could not pay. In fact, SynerMed and PAMC Ltd. retained multiple counsel to represent various persons subject to DMHC subpoenas. Notably, Annex was not a party to any of these agreements and was not identified as the party responsible for these fees even though all of these representations post-dated the Amended APA and were related to the disclosed DMHC investigation.

177. As discussed below, even when the Debtor did file for bankruptcy it failed to identify known judgments pending against it, let alone all of its creditors.

178. Rather, Edwards took the position that SynerMed had no creditors, notwithstanding the fact that the APA did not serve to sever the Debtor's exposure to liabilities.

179. Indeed, to the extent that the Debtor was not already insolvent, the Amended APA whereby SynerMed transferred all of its assets but remained liable for its employees and, further, faced exposure to all of its creditors, rendered the Debtor insolvent. Indeed, the Directors authorized and subsequently paid millions of dollars of executive bonuses notwithstanding their decision to liquidate SynerMed.

180. Not surprisingly, SynerMed's 2018 tax return reflected losses of in excess of $5,000,000, most of which reflected wages and salaries consistent with the Amended APA, which saw SynerMed retain responsibility for said employees while, at the same, retaining no assets to pay these liabilities.

181. On information and belief, the bulk of monies paid by someone on SynerMed's behalf in 2018 reflected retention bonuses notwithstanding the fact that SynerMed had sold all of its assets and purported not to be conducting any ongoing business thereafter.

**I. Annex Transfer to Achievamed**

182. The Trustee is informed and believes and based thereon alleges that the sale to Annex under the APA was the first part of a fraudulent scheme to attempt to shield PAMC Ltd. from the Debtor's liabilities, and, in turn, shield the Debtor's assets from its creditors. The second part was a subsequent transfer of the Debtor's assets from Annex to a newly formed entity, Achievamed.

183. About one month after the Amended APA, on February 20, 2018, Achievamed was formed and registered as a closely held corporation in California by Cheng.

184. When Achievamed was formed, its business address was identical to the Debtor's business address: 1600 Corporate Center Drive, Monterey Park, CA 91745.

185. When Achievamed was formed, its agent for service of process address was identical to the principal address, mailing address, and agent for service of process address of Annex: 560 W. Main Street, #C177, Alhambra, CA 91801.

186. Cheng is the CEO, CFO, Secretary, and a director of Achievamed.

187. The Trustee is informed and believes, and based thereon alleges, that after Cheng facilitated the APA transaction between Annex and the Debtor he then caused these assets, but not the liabilities of SynerMed, to be transferred to Achievamed.

188. After the Amended APA, Cheng controlled the Debtor's assets and all or substantially all of its books and records.

189. On February 5, 2018 SynerMed's counsel wrote to the DMHC advising them as follows:

> As we previously discussed with you, SynerMed recently sold all of its assets to Annex Financial, Inc. ("Annex"). Given Annex's ownership of all of SynerMed's assets, including its business records, we need Annex's consent before producing materials owned by Annex to you.

190. The Trustee is informed and believes and based thereon alleges that at some point thereafter Annex caused SynerMed's assets to be transferred to Achievamed.

191. The Trustee is informed and believes and based thereon alleges that Achievamed is the subsequent transferee of the assets that were transferred from the Debtor to Annex.

**J. The Directors' and Mason's Duties and Breaches of Duties to the Debtor.**

192. Under Article IV, Section 3 of the Debtor's By-Laws, the Directors were required to exercise their powers and perform their duties "in good faith, in the manner such Director believe[d] to be in the best interest of the [Debtor], and with such care, including reasonable inquiry, using ordinary prudence, as a person in a like position would use under similar circumstances."

193. Under Article IV, Section 1 of the Debtor's By-Laws, the Board of Directors had power over the business and affairs of the Debtor, including management of the Debtor and exercising all of its corporate powers.

194. The Directors also had a fiduciary duty of undivided loyalty they owed to SynerMed, not PAMC.

195. The Directors also owe fiduciary duties under California law, including Cal. Corp. Code § 309.

196. The Directors' breaches of fiduciary duties and gross negligence, as addressed herein, caused demonstrable and significant harm to the Debtor, precipitating its bankruptcy.

197. The Directors waited over five years after the Amended APA transaction to file a chapter 7 bankruptcy petition on behalf of the Debtor, even though the Debtor had no assets and massive and ever-increasing liabilities.

198. The Debtor's bankruptcy case was commenced on April 7, 2023 ("Petition Date") when the Debtor filed a voluntary petition for relief under chapter 7 of Title 11 of the United States Code ("Code"), Case No. 2:23-bk-12123-BB, which case is currently pending in the United States Bankruptcy Court for the Central District of California.

199. The claims against the Debtor's Directors, Edwards, Wong, and Li, center around breaches of fiduciary duties of care and loyalty, and gross negligence. The Directors failed to exercise their powers and duties in good faith and failed to exercise their powers and duties in a manner that was in the best interests of the Debtor. Instead, the Directors acted solely in the best interests of PAMC Ltd. to which they were also directors and/or held an ownership interest. The

Directors' breaches of fiduciary duties were particularly negligent and reckless as to their duty to make reasonable inquiry and act with ordinary prudence, especially with regard to the APA transaction since there was no due diligence performed by the Directors. Edwards, who signed the APA (and initialed the Amended APA), had no knowledge or understanding as to Annex's ability to satisfy the Debtor's obligations and contracts with third parties and did not even understand the effect of the APA, let alone the Amended APA. He could not even recall the existence of the Amended APA, which saw SynerMed retaining substantial employee liabilities for no consideration. The Directors' decision to enter into the APA to sell the Debtor's assets and business was done solely to protect PAMC Ltd. and their own personal self-interests to the detriment of SynerMed's creditors.

200. The Directors are not protected based on their reliance, if any, on advice from counsel because the Directors did not act in good faith and with reasonable inquiry because the circumstances of the APA transaction demonstrate that their reliance on counsel (assuming they even received advice insofar as counsel's billing records and memos indicate that they were not consulted until after the APA was entered into) was not made in good faith. Further, there is no evidence that counsel provided any input with respect to the Amended APA.

201. The Directors knowingly entered into the APA while failing to transfer any, let alone all, of the Debtor's liabilities in such a way as to protect the Debtor from remaining liable for the liabilities by (i) failing to have its creditors agree to a novation such that they would only look to Annex for relief [see Civ. Code § 1457], (ii) failing to adequately identify the liabilities transferred and contracts assumed, (iii) failing to seek bankruptcy protection, a receivership or an ABC, and (iv) agreeing to continue to assume all liabilities for SynerMed employees, which liability as first envisioned in the APA was supposed to be transferred to Annex.

202. There is no evidence that SynerMed received any return consideration for assuming the employee liabilities nor any consideration for the subsequent transfer of SynerMed's tax refund (discussed below), which was purportedly on account of SynerMed's obligation to employees and not any liability or asset transferred by way of the Amended APA.

203. The Directors also breached their duties by ignoring any lawsuit that was served on the Debtor and failing to conduct a reasonable inquiry because of the disingenuous position that Annex was responsible for defending Debtor's lawsuits, even though the Directors were aware, or should have been aware, that Annex was not going to assume the Debtor's liabilities because, among other things, two months after the Amended APA, Annex transferred all of the Debtor's assets to Achievamed.

204. The Directors' breaches and gross negligence also relate to their withholding of crucial information from employees, creditors, and third parties who were working with and doing business with the Debtor.

205. For his part, Mason breached his fiduciary duties by (i) initiating a plan to target certain medical specialist providers to be termed or suppressed in violation of Section 1367.02 of the California Health and Safety Code; and (ii) failing to provide sufficient staffing and oversight that allowed an entire department to falsify and fabricate files for health plan audits.

206. Combined, the targeting of specialist providers and the lack of oversight not only led to two whistleblower complaints, but investigations by the DMHC, the loss of all of the Debtor's business and, ultimately, lawsuits from contracting parties.

207. Rather than investigating and prosecuting said conduct by Mason, the Directors orchestrated the APA, ceased to have any employees, delegated the operation of SynerMed to PAMC Ltd. and the Debtor had no employees who could take action seeking redress for Mason's and the Directors' breaches of fiduciary duty.

**K. McDermott's Breaches of Fiduciary Duty and Aiding and Abetting of the Director's and PAMC Ltd. and PAMC Inc.'s Breaches of Fiduciary Duty**

208. At all times, McDermott was counsel for SynerMed with respect to its sale, its wind down, and its responses to multiple government inquiries.

209. McDermott was also counsel for PAMC Ltd. and the PAMC Ltd. Board with respect to SynerMed's sale and wind down. In this capacity, McDermott failed to obtain informed written consent for the obviously conflicted representation.

210. In order to obtain informed written consent, McDermott was first required to disclose in writing all material facts relating to the representation and the conflict. It did not do so.

211. Second, Edwards, who worked for both SynerMed and PAMC was not independent and could not waive the conflict for SynerMed even had full disclosure been made by McDermott. In sum, there were actual conflicts that existed between SynerMed, on the one hand, and PAMC Ltd. and the PAMC Ltd. Board, on the other hand, which conflicts were not disclosed by counsel. Even had such conflicts been disclosed, there were no officers of SynerMed not tainted by the conflict that could have waived the conflict and allowed counsel to represent both SynerMed and the various PAMC constituencies.

212. Notwithstanding the fact that they were SynerMed's counsel, at all times and as discussed herein McDermott was loyal solely to PAMC Ltd. and its board and, conversely, abandoned SynerMed.

213. Among other things, and as admitted by Edwards, McDermott failed to advise SynerMed as to the effect of the APA, while McDermott acknowledged that it provided said advice to PAMC (which advice it has refused to disclose to the Trustee).

214. McDermott failed to point out the serious flaws in the APA, of which it was aware, including the fact that SynerMed remained liable and the host of undefined terms and ambiguities.

215. McDermott failed to advise SynerMed that it could not simply sell and transfer patient information to Annex without raising serious HIPAA concerns if nothing else.

216. McDermott failed to advice SynerMed to respond to complaints filed against SynerMed after the APA even though McDermott was in possession of those complaints and such advice would have been in furtherance of its wind down representation.

217. McDermott failed to counsel SynerMed regarding its patient data and the impropriety of selling and transferring said data to Annex, a debt collector. In fact, it appears that notwithstanding the fact that McDermott represented SynerMed in the sale of its assets, it conducted no due diligence regarding the bona fides of Annex.

218. Edwards testified that he believed that Annex was simply a continuation of SynerMed as a result of the APA, which reflects that McDermott never competently explained to Edwards the nature of an APA.

219. At all times, McDermott was loyal to PAMC Ltd and the PAMC Lt.d Board and to reducing or eliminating PAMC Ltd.'s exposure, while leaving SynerMed to fend for itself.

220. At all times after the APA, McDermott purported to do work for SynerMed, but was paid by PAMC Ltd. and/or PAMC Inc. and was beholden to PAMC Ltd.

221. McDermott never advised SynerMed that it was required by law to retain a copy of its records both under HIPAA and other statutes.

222. On information and belief, after the APA McDermott worked hand in glove with PAMC Ltd. to paper over the flaws in the APA by having Annex execute and back date a Business Associate Agreement even though Annex was not SynerMed's agent and had in fact bought the patient data.

223. McDermott also worked with Edward to alter SynerMed board minutes after receiving a subpoena for said records.

224. McDermott failed to advise SynerMed that it needed to answer the complaint filed by EHS, instead advising SynerMed merely to forward it to Annex even though McDermott knew that Annex was not the real party in interest.

225. On information and belief, McDermott counseled PAMC Ltd. and the PAMC Ltd. Board to **[redacted for privilege, will file under seal].**

226. As to each and every major decision made by SynerMed and PAMC Ltd on SynerMed's behalf alleged herein, on information and belief PAMC Ltd. received counsel from McDermott, which counsel promoted PAMC Ltd.'s interests to the detriment of SynerMed and SynerMed's creditors.

227. At the time that McDermott provided this advice to PAMC Ltd. to the detriment of SynerMed, SynerMed was insolvent.

228. Even after the bankruptcy, McDermott continues to do PAMC Ltd.'s bidding by failing to turn over documents relating to joint representations (which as a matter of law are not

privileged as to SynerMed) and documents relating to the patient files sold by SynerMed to Annex (which files McDermott and PAMC Ltd. had access to because of the government investigations).

229. Indeed, after the Trustee provided a draft of this Complaint on information and belief McDermott advised PAMC Ltd. to purchase the claims currently pending in the bankruptcy in bad faith so as to avoid this lawsuit.

230. The bad faith is obvious because if PAMC Ltd. had the resources to purchase these claims in the first instance there would have been no need for the bankruptcy filing. Rather, the purchase of some of the claims was borne out of the fact that PAMC Ltd. and McDermott took seriously the allegations of malfeasance. Nevertheless, the Trustee and its counsel substantially benefited the estate by forcing PAMC Ltd. and/or McDermott to purchase the claims pending against the Debtor, which PAMC Ltd. and/or McDermott would not have done absent being provided with a draft complaint.

231. However, claims still exist including as-of-yet unscheduled claims relating to privacy violations and HIPAA violations, which claims the Trustee has not been able to investigate or provide notice thereof because PAMC Ltd., McDermott, Annex and Achievamed refuse to provide the data that would identify the class of people harmed by their misconduct. Based, however, on their own internal e-mails the class of creditors exceeds 100,000.

### L. PAMC Ltd. Acting Through the PAMC Ltd. Board and PAMC Inc. Are the Alter Egos of the Debtor and Are Liable to the Estate under a Corporate Veil Piercing Theory.

232. PAMC Ltd. though the PAMC Ltd. Board owned, operated, and controlled the Debtor for its benefit as the sole shareholder of the Debtor. PAMC Ltd.'s directors are the Debtor's Directors, and the Directors acted in the best interest of PAMC Ltd., not in the best interests of the Debtor.

233. As reflected in SynerMed's board minutes (which minutes were subsequently altered) PAMC Ltd. and PAMC Inc., through the control of SynerMed's Directors, caused the Debtor to sell for a *de minimis* amount and transfer all of its assets, leaving the Debtor as a hollow shell with significant liabilities and without a means to satisfy its existing, contingent and potential creditors.

234. PAMC Inc. and PAMC Ltd. caused the APA to be executed solely for the benefit of PAMC Ltd. and its owners and to the detriment of SynerMed and its creditors at a time when SynerMed was insolvent. Having taken control over the process and having SynerMed enter into the APA, PAMC Ltd. and PAMC Inc. exercised total control over SynerMed, such that it was a fiduciary of SynerMed for all intents and purposes at the time of and after the APA (assuming they did not exercise such control at all times).

235. In controlling SynerMed, PAMC Ltd. and PAMC Inc. caused SynerMed to transfer assets and PAMC Ltd. itself transferred SynerMed assets that it otherwise owed to SynerMed and paid those to Annex for no consideration.

236. The PAMC Ltd. Board and had fiduciary duties to SynerMed having taken control of SynerMed including controlling its decision-making process

237. PAMC Ltd. and PAMC Inc. conducted no due diligence as to whether SynerMed's run-off business could be transferred to Annex, which was not an MSO, whether SynerMed could transfer PHI to Annex without violating HIPAA, how SynerMed could satisfy non-assumed obligations, such as over $5,000,000 in employee liabilities, or how SynerMed could satisfy any contractual, governmental, or tort liabilities give that SynerMed remained obligated for these liabilities under California law notwithstanding the Amended APA. Indeed, PAMC Ltd. and PAMC Inc. had no idea what effect the APA and/or the Amended APA would have on SynerMed's liabilities or third party rights against SynerMed.

238. Likewise, PAMC Ltd. and PAMC Inc. did not even determine whether Annex had sufficient assets to cover any of the liabilities that Annex purportedly assumed or what SynerMed's continued obligations were after the entry of the APA.

239. On information and belief, PAMC Ltd. and/or PAMC Inc. continued to fund certain of SynerMed's obligations after the APA, including certain of SynerMed's employee liabilities and attorneys' fees while at the same time failing to protect SynerMed from ongoing litigation and additional liabilities until such time as SynerMed filed for bankruptcy.

240. PAMC Ltd. and PAMC Inc. gave away at least $22 million of SynerMed's assets (as well as an additional $1,870,257.88 in tax refunds) for a *de minimis* amount and did so to protect themselves, not SynerMed and not SynerMed's creditors.

241. Further, PAMC Ltd.'s and PAMC Inc.'s decision to have SynerMed enter into the APA triggered certain employee liabilities that otherwise would not exist. Additionally, certain of SynerMed's employee liabilities consisted of retention bonuses, which themselves were fraudulent transfers as these employees provided no benefit to SynerMed in exchange for these bonuses.

242. Following the APA, SynerMed ceased adhering to corporate formalities. Among other things, it ceased conducting board meetings and PAMC, Inc. and PAMC Ltd., not SynerMed, took over the running of SynerMed, including the outstanding investigations and litigations.

243. All decisions involving SynerMed after the APA appear to have been made by Edwards, as CEO of PAMC Ltd. He could not have made any day-to-day decisions for SynerMed because he was no longer an officer and/or employee of SynerMed and because these were not board level decisions (assuming the Directors ever met again after the APA).

244. In conversations between PAMC Ltd.'s counsel and Annex's counsel in March 2018, Annex's counsel made it clear that despite the fact that Annex took possession of all of SynerMed's data, including PHI, and "despite the language in the agreement, the principals on both sides understood that it was only certain valuable assets that were being purchased and that documents were not among them." Annex's counsel made clear that PAMC Ltd., not Annex, would have to pay for retention of SynerMed's data purportedly transferred as part of the APA and PAMC Ltd., not SynerMed, did so.

245. While counsel spoke to Edwards after the APA, Edwards wore his PAMC Ltd. hat, not his SynerMed hat, and made decisions regarding SynerMed in his capacity as CEO of PAMC, Ltd. Even e-mails sent to him after the APA were directed to his PAMC Ltd. e-mail account, not his SynerMed account, and his responses on behalf of SynerMed were sent as the CEO of PAMC Ltd.

246. PAMC Ltd. and PAMC Inc. and their counsel were and became aware of lawsuits filed against SynerMed. PAMC Ltd. and PAMC Inc. caused SynerMed not to retain counsel and not to answer these complaints. At all times after the APA, PAMC Ltd. and PAMC Inc. made the day-

to-day decisions for SynerMed because, as a result of the APA, the PAMC entities left SynerMed with no employees notwithstanding that SynerMed was still an active company.

247. Indeed, after the APA PAMC Inc. and PAMC Ltd. (along with their counsel) became aware of another lawsuit against SynerMed filed by Centinela-Freeman Emergency Medical Associates (among others). SynerMed's counsel in that matter filed a motion to be relieved as counsel because "as far as counsel is aware, [SynerMed] no longer has any employees. Accordingly, there is no-one at SynerMed who can provide guidance to counsel."

248. The motion to be relieved was provided to PAMC Inc., PAMC Ltd., and their counsel, but they took no actions to ensure that SynerMed retained counsel. On August 30, 2018, SynerMed's answer was stricken by court order.

249. The Debtor and the Debtor's creditors have been harmed by PAMC Ltd.'s and PAMC Inc.'s acts of control and dominion over the Debtor and the complete abandonment of SynerMed.

250. PAMC Ltd. and PAMC Inc., through control of the Directors, had control of the Debtor's day-to-day decision-making after the Amended APA, as well as control of the litigation that the Debtor was involved in, insofar as SynerMed ceased having any employees.

251. PAMC Ltd.'s and PAMC Inc.'s unity of interest and ownership with and of the Debtor, through the Directors, and through their subsequent day-to-day control of the Debtor, demonstrates that it is unjust for the separate personalities of the businesses to exist.

252. PAMC Ltd. and PAMC Inc., through the Directors, caused the Debtor to sell its assets to Annex merely to serve the interests of PAMC Ltd., and PAMC Inc., caused the Debtor to wait years to file its bankruptcy case to decrease the risk of PAMC Ltd. and PAMC Inc.'s own exposure as a result of the APA transaction and transactions between the Debtor and PAMC Ltd. knowing, as it was advised by counsel shortly after the APA was consummated, that it faced potential exposure under a piercing the veil theory and potential exposure for fraudulent transfers.

253. PAMC Ltd. and PAMC Inc. and the Directors purposefully left the Debtor without adequate capitalization, so that the Debtor would not be able to meet its debt obligations.

254. PAMC Ltd. and PAMC Inc. knew that there was no legitimate basis for the APA for SynerMed or its creditors, as it was not a liquidation and provided none of the statutory safeguards

of a bankruptcy, receivership or an ABC, each of which would have required notification to all creditors and other safeguards.

255. PAMC Ltd. and PAMC Inc. also caused the transfer of all of SynerMed's PHI to Annex in violation of HIPAA regulations.

256. In the best interests of justice, it is inequitable that PAMC Ltd., its general partner PAMC Inc., and the Directors can remove all assets of the Debtor to hinder, delay, and defraud creditors and then run the Debtor for the next five years allowing the Debtor's liabilities to skyrocket.

257. Under the circumstances of this case, the alter ego doctrine should be applied to PAMC Ltd. and PAMC Inc. In applying the alter ego doctrine, PAMC Ltd. and PAMC Inc. should be liable for the liabilities of SynerMed.

**M. Damages Caused by the Directors', Mason's, PAMC Ltd.'s and PAMC Inc.'s Breaches of Duties.**

258. After the Amended APA transaction in January 2018, the Directors, PAMC Ltd. and PAMC Inc. failed to conduct any reasonable inquiry into Annex's assumption of the Debtor's liabilities and whether Annex satisfied any of the Debtor's liabilities, let alone whether the Debtor was shielded from said liabilities including employee and contractual liabilities.

259. After January 2018, the Directors, PAMC Inc. and PAMC Ltd. knew or should have known that Annex failed to satisfy any of the Debtor's liabilities that were purportedly transferred to Annex.

260. At all times, including after the Debtor became insolvent, the Directors acted in the best interests of PAMC Ltd., not SynerMed, and to the detriment of SynerMed's creditors to whom they owed a fiduciary duty as a result of SynerMed's insolvency.

261. The Directors did not act in good faith either before or after the Amended APA because they conducted no due diligence as to whether Annex could service Debtor's business, could take possession of confidential medical information subject to HIPAA regulations, satisfy any of the Debtor's liabilities transferred (to the extent the Directors even knew the extent of those liabilities) and post-APA knew that Annex did not have any ability to assume and was not assuming

all of the Debtor's liabilities since there was no identification or list of what liabilities were assumed by Annex, SynerMed, not Annex, was satisfying employee liabilities, and SynerMed defaulted on an outstanding complaint.

262. The Directors failed to make any inquiry, much less a reasonable inquiry, into Annex's satisfaction of the obligations under the Amended APA, and they failed to enforce the Amended APA in good faith and in the best interests of the Debtor and its creditors, as opposed to PAMC Ltd.

263. In point of fact, PAMC Ltd. and PAMC Inc., not SynerMed, controlled the decision as to whether to enter into the APA. PAMC, not SynerMed, entered into the APA for the benefit of PAMC Ltd. and to the detriment of SynerMed and its creditors. PAMC Ltd. and PAMC Inc. did so at a time when SynerMed was insolvent, which insolvency only grew as a result of the APA.

264. On information and belief, after the Amended APA, PAMC Ltd. and/or PAMC Inc., not SynerMed (as SynerMed had transferred all of its assets) funded some of SynerMed's liabilities including its liabilities to SynerMed's counsel and SynerMed's employees, among others.

265. The Trustee is informed and believes and based thereon alleges that the Directors, PAMC Inc. and PAMC Ltd. knew that Annex planned to transfer the Debtor's assets to a new entity (Achievamed), leaving both the Debtor and Annex without any assets of which they could satisfy the Debtor's liabilities.

266. The Trustee is informed and believes and based thereon alleges that the Directors, PAMC Inc. and PAMC Ltd. acted with fraudulent intent to delay, hinder, and defraud creditors of the Debtor's bankruptcy estate by entering into the APA and transferring the Debtor's assets. Indeed, there was no valid business purpose for the APA (or the Amended APA) insofar as SynerMed did not know what assets it transferred and did not eliminate any of SynerMed's liabilities. To the extent that it sought a liquidation of its assets, the APA was not designed to nor did it accomplish this goal nor could any reasonable person believe that that was its intended purpose. The Amended APA did the opposite: it transferred all of SynerMed's assets while retaining substantial liabilities for SynerMed. PAMC Ltd.'s and PAMC Inc.'s control of SynerMed was designed solely to keep SynerMed from filing for bankruptcy protection in an attempt to have the

statute of limitations run for the benefit of PAMC Ltd. and PAMC Inc. and solely to the detriment of SynerMed's creditors.

267. The Trustee is informed and believes and based thereon alleges that the Directors, PAMC Inc. and PAMC Ltd. caused damages to the Debtor's bankruptcy estate by intentionally failing to enforce the APA to the detriment of creditors and the bankruptcy estate and by agreeing to the Amended APA, which amendment served no legitimate purpose.

268. The Trustee is informed and believes and based thereon alleges that the total damages from the Directors' breaches of fiduciary duties to the Debtor's bankruptcy estate is at least the amount of assets that was fraudulently transferred to Annex and the resulting default judgments.

269. Based on the Debtor's 2018 federal tax return, the Debtor transferred $21,905,209 in assets to Annex. The Debtor also transferred tax refunds to Annex in the amount of $1,870,257.88, which refunds did not belong to Annex under any reading of the APA.

270. The Debtor was the subject of an over $227 million judgment at the time the draft complaint was forwarded to PAMC Ltd. and McDermott and an over $1.5 million judgment resulting from its defaults and other claims of creditors, which claims went unredressed by SynerMed and/or PAMC Ltd.

271. The Debtor also is the subject of other claims including tax claims, which claims may increase based upon the submission by the Debtor of a amended tax returns based on alleged losses in 2018, as discussed below.

**N. Debtor's Tax Refund and Fraudulent Conduct Regarding Debtor's Tax Returns**

272. On July 16, 2021, the Debtor received a tax refund check from the U.S. Treasury in the amount of $208,891.27. On August 10, 2021, the Debtor received a tax refund check from the U.S. Treasury in the amount of $1,661,366.61. The two checks pertained to the restating of tax returns for the tax years 2013 and 2014 (the "Refund Checks") based on alleged SynerMed losses in 2018.

273. The tax refunds were based upon the Coronavirus Aid, Relief, and Economic Security Act of 2020 (the "CARES Act"), that allowed corporations to carry back net operating losses in a tax



2995324_2

year beginning after December 31, 2017 to each of the five tax years preceding the tax year in which the loss arose.

274. In this case, SynerMed used its purported 2018 losses to restate operating profits on its 2013 and 2014 tax returns, which resulted in the above tax refunds.

275. Prior to the passage of the CARES Act, SynerMed did not have a right to said refunds. Thus, these were not assets that existed at the time of the APA; rather, these came into being in 2020 with the passage of the CARES Act.

276. Further, and inexplicably, SynerMed did not use BDO to submit restated tax returns for the years 2013 and 2014 seeking refunds, but said tax returns were submitted by an accounting firm named Moss, Levy & Hartzheim ("MLH").

277. Both SynerMed and PAMC failed to turn over any documents reflecting how SynerMed was able to pay in excess of $5,000,000 in wages and salaries consistently in 2018 given that it had transferred all of its assets to Annex and did not have any monies to make these payments. There may be an unscheduled tax claim in the event that discovery reflects that SynerMed did not incur and pay these losses in 2018, as it resulted in tax refunds to which SynerMed to which it was not entitled (if it did not pay these losses).

278. The IRS may have an unscheduled claim against the Debtor based upon its restated tax return if, in fact, the Debtor did not pay these liabilities and, thus, did not have a basis to restate its prior returns. To the extent that these liabilities were paid by Annex with monies transferred to it as a result of the APA, these were not the Debtor's monies and would not have entitled the Debtor to claim tax refunds in prior years. To the extent PAMC paid these employee liabilities this, too, should not have afforded the Debtor the right to restate its prior tax returns. Rather, these payments by others would simply have been a gift to the Debtor, which may have required disclosure and tax paid thereon.

279. Nevertheless, SynerMed received tax refunds relating to the restatement of its 2013 and 2014 tax returns. Thereafter, the Debtor, at the direction of Edwards, transferred the Refund Checks to Annex notwithstanding the fact that the Amended APA did not have a provision for the

transfer of after acquired assets to Annex, let alone assets to which SynerMed had no pre-existing claim thereto at the time of the Amended APA.

280. The Debtor's legal entitlement to the Refund Checks, if at all, arose long after the APA and/or Amended APA went into effect, and Annex and/or Achievamed were not entitled to after-acquired assets of the Debtor under the Amended APA.

281. To the contrary, the Refund Checks were and are property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 541 assuming, of course, that SynerMed in fact had losses in 2018 that SynerMed itself paid.

282. Nothing in the APA transferred this post-APA asset, which did not exist at the time of the APA, to Annex. In other words, the tax refund belonged solely to SynerMed (assuming SynerMed paid and incurred actual liabilities in 2018), SynerMed had no basis to transfer these tax refunds to Annex, and the transfer of those funds not only constituted a fraudulent transfer but also a breach of fiduciary duty by the Directors.

283. Both Edwards and Cheng knew that the losses did not pre-date the APA and, further, that the 2018 losses were losses of SynerMed, and not indicative of assets or liabilities assumed by Annex. Recognizing that Annex had no right to the benefit from the restatement of SynerMed's tax returns based upon these losses, Cheng attempted to have BDO restate SynerMed's 2017 tax return to include SynerMed's 2018 losses.

284. As BDO advised Cheng and Edwards in mid-2018:

> The real issue is that the loss was not in fact not written off on the company's books in 2017 as it was not incurred until the following year in early 2018. The IRS looks to when the loss was incurred. The loss was incurred in 2018 when the assets were sold and the liabilities were assumed pursuant to the asset sale agreement. Hence there is a timing difference between when the loss was accrued for and incurred, and the year end in between has complicated this fact. ***As an FYI the tax loss that we are talking about generally is attributable to the C-Corporation "SynerMed" which as I understand was not sold and the stock is still owned by PAMC***.

285. Accordingly, the Debtor still claimed to pay wages and salaries of $5,383,284 on its 2018 tax return, even though, according to Edwards, the Debtor had no employees after January 19,

2018 and, further, provided Annex with an additional windfall of $1,870,257.88, which belonged solely to the Debtor as explained by BDO to Cheng and Edwards.

**O. PAMC Ltd. and Edward's Continuing Breaches**

286. In furtherance of his efforts to harm SynerMed creditors, Edwards provided a declaration in the action styled *Vazquez v. SynerMed, Inc.*, *et al.*, 18STCV01881 (LASC Dec. 14, 2020).

287. In that action, Ms. Vazquez sued SynerMed, Achievamed, and others for whistleblower violations, sex/gender harassment and retaliation, race/nation origin harassment and retaliation, and California labor code violations.

288. In seeking and prevailing on summary judgment on the basis that the APA severed SynerMed's liability to Ms. Vazquez, Edwards provided a declaration in December 2020 where he purported to provide a "true and correct copy of the Asset Purchase Agreement."

289. The version presented by Edwards was the original APA, not the Amended APA, which replaced the APA and which subsequent version foreclosed the factual foundation for SynerMed's summary judgment motion.

290. Specifically, the superior court judge in ruling in favor of SynerMed relied exclusively on Section 4.5(c) of the APA to the effect that "Annex is the party liable for any obligations owed to Plaintiff arising from or in connection with her employment."

291. Of course, Edwards personally signed off on the revisions to the APA found in the Amended APA and, specifically, the removal of the entirety of Section 4.5 of the APA such that SynerMed remained liable for all employee liabilities.

292. Consistent therewith, Edwards signed a tax return created by BDO based off the Amended APA that affirmed SynerMed's ongoing and continuing obligation for employee liabilities. He did so notwithstanding the fact that SynerMed received no consideration for removing Section 4.5(c) and had no assets to pay such employee liabilities having transferred all of its assets to Annex.

293. Further in June 2020, a mere six months before Edwards executed this declaration, he was provided with amended 2013 and 2014 tax returns for SynerMed, which sought refunds in those

tax years based upon SynerMed's losses in 2018, which losses were purportedly based upon SynerMed's retention of employee liabilities under the APA and SynerMed's payment of over $5 million based thereon.

294. Thus, in furtherance of the ongoing efforts to hide the true effect of the Amended APA, Edwards bore false witness, and which false testimony was relied upon by the court.

**P. Tolling of the Statute of Limitations**

295. The Trustee is informed and believes and based thereon alleges that the claims against the Directors, PAMC Ltd., and PAMC Inc. are valid and timely given ongoing breaches of fiduciary duty and breaches of contract at the time of SynerMed's bankruptcy filing and the fact that SynerMed had no employees left to raise these claims or the fraudulent transfer claims. The Directors, to the extent they were still directors of SynerMed, were compromised given their roles at PAMC Ltd. and otherwise never conducted another SynerMed board meeting.

296. The claims against McDermott are also valid and timely given that SynerMed was adversely dominated, McDermott failed to give the requisite disclosures and McDermott's representation of SynerMed (although paid by PAMC) continued to the date of the bankruptcy when SynerMed was wound down. To date, McDermott has produced no documents evidencing that it terminated its representation of SynerMed at any time prior to the filing of SynerMed's bankruptcy.

297. Nevertheless, any such statute of limitations were tolled from the date of the APA to the Debtor's Petition Date because as a result of the APA SynerMed ceased to have any employees and was dominated and controlled by the Directors and PAMC Inc. for their own benefit and the benefit of PAMC Ltd. to the sole detriment of SynerMed and its creditor body.

298. In exercising this control to the detriment of SynerMed and its creditors, the Directors, PAMC Inc. and McDermott caused SynerMed to wait for five years to file the bankruptcy petition notwithstanding the fact that SynerMed was hopelessly insolvent prior to and certainly as a result of the APA and was incurring significant liabilities thereafter—inclusive of at least two massive default judgments and millions of dollars of employee liabilities.

299. The Trustee is informed that the Directors, PAMC Inc., and McDermott worked together to minimize disclosure of the APA and its effect on SynerMed, SynerMed did not disclose

(other than to its accountants) the Amended APA and SynerMed's assumption of employee liabilities, SynerMed did not disclose (and in fact allowed Annex to use SynerMed's accountants) the subsequent tax refunds it received and paid over to Annex, and SynerMed did not disclose to its patients that it had sold and transferred their medical data to a debt collector.

300. Rather, on information and belief PAMC Ltd. and/or PAMC Inc. paid certain ongoing liabilities, including to counsel and employees in order to hide SynerMed's dire financial condition and avoid public disclosure of SynerMed's insolvency and fraudulent transfers. On information and belief, PAMC even paid to store SynerMed's data necessary to respond to ongoing investigations. As Edwards conceded to counsel, "[w]e do not have much choice, but to cover the costs. We may have to eventually download the data into a separate server that we can house at PAMC."

301. The Directors only disclosed the APA (and did not disclose the Amended APA) on a need to know basis and otherwise failed to disclose its HIPAA violation in the wholesale transfer of its business records including PHI to Annex, let alone its transfer of more than $23 million to Annex that might otherwise have been available to pay creditors. Even when SynerMed ultimately sought bankruptcy protection, its filing failed to identify either the EHS or Angeles-IPA default judgments. It even failed to disclose the Amended APA.

302. There were no innocent officers or directors that existed at SynerMed as a result of the APA and/or Amended APA that were in a position to seek redress nor any innocent shareholders given that PAMC Ltd. was the sole owner of SynerMed and controlled SynerMed at all relevant times through PAMC Inc. As SynerMed repeatedly stated, as a result of the Amended APA it had no employees other than the Directors, whose loyalty was divided and Edwards with the material assistance of McDermott made decisions for SynerMed after the Amended APA in his capacity as the CEO of PAMC Ltd.

## FIRST CLAIM FOR RELIEF

## BREACH OF FIDUCIARY DUTY

**[Against Wong, Li, Edwards, Mason, Kwan, Moy, Ma, Chow, PAMC Ltd., PAMC Inc., and McDermott]**

303. Plaintiff incorporates each of the general allegations above as if fully set forth herein.

304. The Trustee is informed and believes, and based thereon alleges, that Edwards, Wong, and Li were each one of the Directors of the Debtor, as well as officers and/or directors of PAMC Ltd. As Directors of the Debtor, Edwards, Wong, and Li owed fiduciary duties to the Debtor, including but not limited to a duty of loyalty, good faith and fair dealing, and an obligation to perform his or her duties on behalf of the Debtor as a reasonably prudent person would do in a like position as a fiduciary of a business, acting in the best interests of the Debtor.

305. The Directors, as fiduciaries of the Debtor, were required to act in the best interests of the Debtor, were required to serve the Debtor in good faith, were required to conduct proper oversight in the Debtor's best interests, and were required to act with due care, including reasonable inquiry.

306. The Directors breached their fiduciary duties owed to the Debtor when they failed to act reasonably with due care based on a lack of competence, a lack of proper supervision and oversight, a failure to maintain proper internal controls, a failure to act in good faith, a failure to make reasonable inquiry, and a failure to conduct due diligence.

307. The Directors, among other things, breached their fiduciary duties by failing to conduct a reasonable inquiry and to act with due diligence as it relates to the APA with Annex. Among other things, the Directors admittedly conducted no due diligence with respect to the terms and conditions of the APA, the financial wherewithal of Annex, the ability of Annex to act as an MSO, HIPAA issues relating to the transfer of all of SynerMed's patient records, and even the amount of the assets they were transferring or the liabilities actually being assumed.

308. By failing to act as a reasonable prudent person in carrying out their duties as a fiduciary, the Directors operated or acted in a manner that caused serious and detrimental harm to the Debtor because the Debtor was left as a hollow shell without any means to satisfy or pay its debt obligations.

309. The Directors further breached their duties by fraudulently transferring the Refund Checks to Annex, Achievamed, and/or Cheng, even though the Refund Checks were property of the Debtor's estate and was not subject to the APA.

310. The Directors further breached their duties by agreeing in the Amended APA to take

on the otherwise transferred employee liabilities without any consideration from Annex.

311. The Directors breached their duties of loyalty by at all times acting for and on behalf of PAMC Ltd. and to the detriment of SynerMed and its creditors at a time when SynerMed was insolvent. In fact, the Board was controlled and acted on behalf of PAMC Ltd. and PAMC Inc., not SynerMed, which controlled the decision to enter into the APA and all other decisions thereafter.

312. The Trustee is informed and believes, and based thereon alleges, that the Directors knew or should have known that their conduct was not reasonable and that their failure to act as a reasonably prudent person in a similar position caused the collapse of the Debtor's financial condition.

313. The Trustee is informed and believes, and based thereon alleges, that to the extent the Directors did not have actual knowledge of the Debtor's financial condition, the Directors were required to make a reasonable inquiry or to retain advisors or professionals who could assist with their failure to carry out their fiduciary duties.

314. The Directors did not act in good faith or with reasonable diligence by forcing the Debtor to enter into the APA.

315. The Directors acted in the best interests of PAMC Ltd., and its general partner, PAMC Inc., by selling all of the Debtor's assets for little or no consideration and, in this regard, breached their fiduciary duties of loyalty owed to SynerMed and its creditors.

316. Mason was the President and CEO during the relevant period wherein SynerMed was subject to two whistleblower complaint, government investigations, and the loss of all of its business, which led to lawsuits against SynerMed.

317. The allegations in the whistleblower complaints, substantiated and agreed to in part by SynerMed with the DMHC, arose from Mason's control of and decision-making on behalf of SynerMed, including rampant falsification and fabrication of files for health plan audits due to inadequate staffing and exposure for violation of Section 1367.02 of the California Health and Safety Code for rendering coverage decisions based primarily on cost.

318. Mason's actions lead to the lawsuits filed by EHS and Angeles-IPA, among other liabilities of SynerMed, as well as SynerMed's insolvency and the loss of all of its business.

319. PAMC Ltd. and PAMC Inc. are alter egos of SynerMed insofar as at all relevant times they controlled the decision to enter into the APA and controlled SynerMed thereafter (as SynerMed had no employees after the APA was executed) and it would be unjust, under the circumstances, to treat PAMC Ltd. and PAMC Inc. as separate entities.

320. The PAMC Ltd. Board assumed control of and exercised dominion over SynerMed with respect to the APA and the operations of SynerMed thereafter. Having taken control over SynerMed and its decision making, the PAMC Ltd. Board owed a fiduciary duty to SynerMed and SynerMed's creditors. The PAMC Ltd. Board committed the same breaches to SynerMed as did the Synermed Board discussed above and herein.

321. To that end, PAMC Ltd. and PAMC Inc. took control of SynerMed and at all relevant times made decisions on behalf of SynerMed, which decisions were made solely for the benefit of PAMC Ltd. and PAMC Inc. Having assumed control of SynerMed, PAMC Ltd. and PAMC Inc. owed fiduciary duties to SynerMed and, upon its insolvency, to SynerMed's creditors.

322. PAMC Ltd. and PAMC Inc. breached their fiduciary duty when they took the same actions as the Directors discussed above for the benefit of PAMC Ltd. and PAMC Inc. and to the detriment of SynerMed and its creditors.

323. McDermott breached its fiduciary duty of loyalty to SynerMed, as set forth in more detail above, by taking on multiple representations on behalf of SynerMed including joint representations, by failing to disclose the existence of conflicts, by failing to get informed consent after full disclosure, and by thereafter abandoning SynerMed for the benefit of PAMC and its directors. At all relevant times, McDermott failed to provide advice to SynerMed because such advice was not in the best interests of PAMC. Among other things, McDermott did no due diligence with respect to Annex, did not adequately or thoroughly analyze the APA, did not advise SynerMed as to the legal consequences of an APA, did not advise SynerMed to respond to complaints filed against it after the APA, did not advise SynerMed of the impropriety of selling and transferring PHI, assisted PAMC in backdating documents and altering business records, and assisted PAMC in keeping SyneMed from filing for bankruptcy notwithstanding the fact that it was insolvent and facing hundreds of millions of dollars in claims (not to mention potential claims when patients find

out about the sale of their PHI).

324. The breaches of fiduciary duty by these defendants began prior to the entry of the APA and continued thereafter until the time SynerMed filed for bankruptcy protection.

325. The Directors, PAMC Inc. and PAMC Ltd. caused damages to the Debtor by entering into an APA, instead of an ABC or bankruptcy, which APA was not the equivalent of an ABC or bankruptcy and which APA intentionally harmed SynerMed's creditors by transferring all of SynerMed's assets to an entity that had no direct obligation to SynerMed's creditors, was not licensed or accredited to carry out SynerMed's business and that otherwise was not in a position to satisfy most, if not all, of SynerMed's liabilities.

326. By breaching their fiduciary duties, the Directors, PAMC Ltd., PAMC Inc. and McDermott proximately caused damages to the Debtor, including but not limited to, the dissipation of corporate assets in an amount in excess of $24 million, incurring the over-$227 million and $1.5 million judgments, the failure to take any corrective action and the potential for hundreds of millions of dollars in potential personal claims and HIPAA fines (once patients are advised of the sale of their PHI), and harm to the Debtor and its creditors, both individually and collectively.

327. The Trustee is informed and believes and based thereon alleges that the total damages from the Directors', PAMC Ltd.'s and PAMC Inc.'s breaches of fiduciary duties to the Debtor's bankruptcy estate is at least the amount of assets that was fraudulently transferred to Annex plus the judgments obtained by EHS and Angeles and may also include tax improprieties relating to the restating of SynerMed's prior tax returns, as well as hundreds of millions of dollars relating to the sale of PHI (which the Trustee will be in a position to value once PAMC Ltd. provides the patient data and once those patients are notified of SynerMed's breach caused by PAMC Ltd. and PAMC Inc. with the material assistance of McDermott.

328. As for McDermott, its breaches to the Debtor continue, given its actions postpetition to shield PAMC Ltd. from liability including its efforts to purchase claims from the bankruptcy estate after PAMC Ltd. received a copy of the draft complaint.

329. The Trustee is informed and believes and based thereon believes that there are unscheduled creditors, patients whose files were sold by SynerMed to Annex, who have claims for

invasion of privacy. The Trustee is informed and believes that the HHS (and perhaps other governmental agencies) tasked with enforcing HIPAA violations, have unscheduled claims based upon the Trustee's investigation that revealed that SynerMed sold all of the health patient data in its possession to Annex. Those claims conservatively could be worth more than the $225,000,000 judgment bought off by PAMC and McDermott after they received a copy of the Trustee's draft complaint. However, that amount cannot be quantified unless and until Synermed, PAMC Ltd., PAMC Inc. McDermott, Annex, and/or Achievamed turn over the approximately 8 terabytes of data sold by SynerMed to Annex, which contained patient records and PHI. To date, these parties have refused to turn over this information despite requests from the Trustee.

330. As a result of the Defendants' prepetition actions in violating their fiduciary duties to the Debtor, the Debtor's estate was damaged in an amount according to proof at trial, but not less than $225,000,000.

331. In light of providing a draft complaint to these Defendants, the Trustee has already benefitted the estate by removing the $225,000,000 judgment from the creditor body. Thus, the total damages to the estate, including unscheduled claims described above, is in an amount according to proof at trial, though presently estimated to be in excess of $250,000,000.

332. The Trustee is informed and believes, and based thereon alleges, that the Directors, McDermott, PAMC Ltd., and PAMC Inc. are jointly and severally liable for the damages caused even if they did not personally receive benefits from their breaches of fiduciary duty.

**SECOND CLAIM FOR RELIEF**

**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

**[Against McDermott]**

333. Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

334. In addition to breaching its own fiduciary duties owed to its client, SynerMed, McDermott provided material assistance to PAMC Ltd. in its breaches of fiduciary duties owed to its wholly owned subsidiary, SynerMed.

335. The material assistance included, without limitation, providing advice regarding the APA, continuing to represent PAMC to the detriment of SynerMed including keeping SynerMed

from filing for bankruptcy, altering board records, providing advice regarding outstanding litigations, hiding the fact that SynerMed had sold and was no longer in possession of patient records containing PHI (while not disclosing that Annex was not SynerMed's agent), and providing advice to PAMC to the exclusion of SynerMed with respect to entering into the APA.

336. At all times, McDermott knew that PAMC Ltd., PAMC Inc. and Board were breaching their fiduciary duties to SynerMed. In fact, McDermott knew that PAMC Ltd. and PAMC Inc. controlled and ran SynerMed at the time it entered into the APA and thereafter.

337. From that point and to the present, McDermott has provided substantial assistance in execution of PAMC Ltd. and PAMC Inc.'s scheme to protect themselves to the detriment of SynerMed and its creditors, and in hiding this from SynerMed's creditors and patients.

338. Even after the bankruptcy, after PAMC Ltd. and PAMC Inc. received the Trustee's draft complaint on information and belief McDermott advised PAMC Ltd. and/or PAMC Inc. to purchase the bankruptcy claims in a failed effort to avoid this lawsuit, having to disclose the privileged communications even though the Trustee has a right to same, and having to disclose the names of the hundreds of thousands of patients whose PHI was sold and transferred.

339. As a result of the Defendants' prepetition actions in violating their fiduciary duties to the Debtor, the Debtor's estate was damaged in an amount according to proof at trial, but not less than $225,000,000. Thus, McDermott is liable for aiding and abetting this significant harm to the estate in at least that amount.

340. In light of providing a draft complaint to the Defendants, including McDermott, the Trustee has already benefitted the estate by removing the $225,000,000 judgment from the creditor body. Thus, the total damages to the estate, including unscheduled claims described above, is in an amount according to proof at trial, though presently estimated to be in excess of $250,000,000.

**THIRD CLAIM FOR RELIEF**

**CIVIL CONSPIRACY**

**[Against Wong, Li, Edwards, Kwan, Moy, Ma, Chow, PAMC Ltd., PAMC Inc., and McDermott]**

341. Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

342. The Trustee is informed and believes, and based thereon alleges, that the Defendants conspired together to fraudulently transfer the Debtor's assets to a new entity, Annex, which later transferred those assets to Achievamed in derogation of the fiduciary duties they collectively owed to SynerMed. Edwards, Li and Wong owed fiduciary duties to SynerMed as Directors, Cheng, Annex and Achievamed owed fiduciary duties to SynerMed as SynerMed's agent that agreed to take on SynerMed's liabilities, and PAMC Ltd. and PAMC Inc., which at all material times controlled SynerMed and caused SynerMed to enter into the APA solely for the alleged benefit of PAMC Inc. McDermott also owed fiduciary duties to SynerMed with respect to its sale, wind down and governmental investigations and with respect to its obligations to make disclosure to SynerMed regarding any material information revealed to it after taking on those representations.

343. The Trustee is informed and believes, and based thereon alleges, that when the Debtor entered into the APA, the Defendants were aware that all of the Debtor's assets would be transferred to Annex.

344. The Trustee is informed and believes, and based thereon alleges, that PAMC Ltd., PAMC Inc. Edwards, Wong, Li and McDermott knew that the APA misrepresented the nature and extent of the transfer because they knew or should have known that Annex was not going to satisfy the liabilities of the Debtor after the APA, was not in a position to do so, that the APA would not eliminate SynerMed's liabilities, that the APA did not in fact transfer all of SynerMed's liabilities let alone sever SynerMed's obligations, the APA did not address HIPAA and assignment issues and whether Annex could provide the services required to be provided by SynerMed, and the APA was entered into as an artifice solely to protect PAMC Ltd. from pending litigation and investigations, as well as expected litigation.

345. The Trustee is informed and believes, and based thereon alleges, that at the time of the APA transfer, the Defendants had knowledge that the Debtor's liabilities would not be assumed by Annex or had no reasonable based to believe that Annex, and then Achievamed, would not be in a position to satisfy such liabilities. In any event, they knew that Annex simply purchases assets and was not a continuation of SynerMed's business, was not SynerMed's agent, and had no right to purchase PHI held in SynerMed's trust.

346. Edwards, Li, Wong, PAMC Ltd. and McDermott knew that the APA did not serve to sever SynerMed's liability for all of the liabilities purportedly transferred to Annex insofar as Edwards, Li, Wong, and McDermott failed to get a novation from any of its then creditors and contracting partners and, further, never sought to get consent from any contracting parties to any assignment from SynerMed to Annex.

347. Indeed, after entering into the APA, the Directors on behalf of SynerMed (if McDermott is to be believed) first sought advice of counsel relating to the APA, which counsel advised the Directors that the APA was poorly drafted and contained a host of significant issues and, further, that SynerMed would remain liable for all of its allegedly transferred liabilities.

348. On information and belief, McDermott had in fact provided this advice to PAMC Ltd. before the APA was executed, but is improperly withholding this advice from the Trustee.

349. Edwards, Li, Wong, PAMC Inc., PAMC Ltd. and McDermott knew that Annex was not a licensed MSO and, further, that SynerMed handled and possessed sensitive patient information subject to HIPAA, but they failed to ensure that the transferee, Annex, was entitled to obtain and possess such information or was otherwise compliant with HIPAA regulations.

350. Edwards, Li, Wong and McDermott performed absolutely no due diligence before entering into the APA. They did no background check on Cheng or Annex. The Directors believed that the APA was a liquidation, when on its face it was no such thing.

351. Each of the Edwards, Wong, Li and McDermott breached their fiduciary duties to the Debtor by failing to conduct a reasonable inquiry into the terms of the APA and further breached their fiduciary duties by failing to conduct any due diligence, including failing to read the APA, before approving said APA on behalf of the Debtor.

352. Each of the Defendants knew that the APA as drafted served no legitimate purpose.

353. The Trustee is informed and believes, and based thereon alleges, that the APA's statement that all liabilities of the Debtor would be assumed by Annex was a misrepresentation.

354. The Trustee is informed and believes, and based thereon alleges, that the Defendants had knowledge of the APA's misrepresentation regarding the liabilities assumed under the transaction.

355. The Trustee is informed and believes, and based thereon alleges, that the Defendants conspired together on or around January 17, 2018 to enter into the APA with the intent to defraud the Debtor's creditors.

356. The Trustee is informed and believes, and based thereon alleges, that the Debtor's bankruptcy estate and creditors have been damaged in an amount to be proven at trial, which was caused by the Defendants conspiracy to commit fraud by entering into the APA.

357. Annex and Achievamed are alter egos of Cheng for purposes of the APA and the transfer of all of the Debtor's assets under the APA.

358. PAMC Ltd. and PAMC Inc. are alter egos of SynerMed for purposes of the APA and the transfer of all of the Debtor's assets under the APA insofar as they controlled the decision to enter into the APA and controlled SynerMed at all times thereafter, including the decision not to respond to complaints and allowing the entry of default judgments against SynerMed.

359. Wong and Li acted in the best interests of PAMC Ltd. and PAMC Inc. by deciding for the Debtor to enter into the APA in the best interests of PAMC Ltd., not SynerMed.

360. Wong and Li did not act in the best interests of the Debtor by forcing Edwards to sign the APA.

361. Wong, Li, Edwards and McDermott all owed fiduciary duties to the Debtor.

362. Likewise, PAMC Inc., which controlled the Debtor through Wong, Li and Edwards, had a fiduciary duty to the Debtor insofar as it exercised complete control over SynerMed and, notably, entered into the APA for the benefit of PAMC Ltd. and its shareholders, and not for the benefit of SynerMed.

363. The Trustee is informed and believes, and based thereon alleges, that Wong, Li, PAMC Ltd., PAMC Inc., and McDermott, all of whom owed fiduciary duties to SynerMed, are jointly and severally liable for the damages caused based upon the acts of each member of the conspiracy.

**FOURTH CLAIM FOR RELIEF**

**ACTUAL INTENT FRAUDULENT TRANSFER, CAL. CIV. CODE § 3439.04(a)(1)**

**[Against Annex, Achievamed, Cheng]**

364. Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

365. The Debtor transferred all of its assets to Annex with the actual intent to hinder, delay, and defraud the creditors of the Debtor.

366. The Debtor concealed the APA transfer to Annex by allowing Annex to do business as "Synermed," even though the APA provided that the Debtor was to continue operating its business in the ordinary course of business.

367. After the APA was effective, the Debtor purportedly retained liabilities that were allegedly transferred under the APA without retaining any assets to pay those liabilities.

368. The Debtor's employees that were transferred to Annex remained on the Debtor's payroll for months after the APA and after Edwards testified that the Debtor had no employees.

369. The Debtor or PAMC on its behalf continued to pay wages and salaries of employees after January 19, 2018 that were allegedly transferred under the APA.

370. The APA transfer to Annex was substantially all of the Debtor's assets.

371. Before the APA transfer to Annex, the Debtor had been sued or threatened with lawsuits, was the subject of multiple government investigations, and whistleblower complaints, all of which were known to the Debtor. The Debtor made no effort to quantify those claims.

372. Before the APA transfer to Annex, the Debtor had begun the transition of its business to another MSO in light of the NOA and other findings relating to the Debtor's operation.

373. The value exchanged with the Debtor under the APA was not reasonably equivalent to the value of the assets transferred to Annex.

374. Indeed, the Debtor admitted that it had no idea what assets or liabilities were transferred by way of the APA and allowed Annex's principals to instruct the Debtor's accountants in determining the value of the APA assets and liabilities transferred.

375. The Debtor transferred over $23 million in assets to Annex and, on information and belief, did so solely to place these assets out of the reach of creditors with the actual intent to hinder, delay, and defraud creditors of the Debtor.

376. The Debtor never identified a legitimate business purpose for entering the APA. The Debtor did not know Annex, did not have any information regarding Annex's assets and

wherewithal to service any liabilities of the Debtor.

377. By the Debtor's principal's own admission, the APA was a fire sale and no due diligence was conducted prior to entering into the APA.

378. The Debtor allegedly received a mere $250,000 from Annex in exchange for all assets of the Debtor existing at the time while SynerMed retained or was otherwise still directly responsible for all of SynerMed's liabilities insofar as (i) SynerMed agreed in the Amended APA to retain all employee liabilities and (ii) SynerMed failed to advise all of its creditors of the APA and obtain novations such that its contracting parties would look only to Annex to satisfy any obligations.

379. The Debtor was insolvent before the APA and was clearly insolvent as a result of the APA transfer.

380. The APA transfer was less than two years before EHS obtained a $227+ million default judgment against the Debtor and the APA transfer took place while significant government and whistleblower claims were pending.

381. The Debtor also fraudulently transferred the Refund Checks to Annex, without any exchange of value, and with the actual intent to hinder, delay, and defraud creditors of the Debtor.

382. The Debtor also fraudulently transferred its patient records, which records included PHI.

383. Achievamed and/or Cheng were subsequent transferees of the Debtor's assets.

384. Of the Debtor's assets that Annex received, Annex transferred some or all of those assets to Achievamed and/or Cheng.

385. Cheng and Achievamed are the alter egos of Annex and each other for the purposes of receiving the Debtor's assets after the APA transfer.

386. The Trustee is informed and believes, and based thereon alleges, that Achievamed was created to give the appearance of operating the Debtor's business months after the APA.

387. The Trustee is informed and believes, and based thereon alleges, that Achievamed was created to shield the fraudulent transfer of the Debtor's assets from the Debtor's creditors.

388. Achievamed was not a bona fide purchaser of the Debtor's assets from Annex because Cheng, who is the founder, officer, and director of Achievamed, had actual knowledge of

the APA transfer.

389. Achievamed and Cheng did not receive the Debtor's assets in good faith from Annex.

390. The actual intent fraudulent transfers are avoidable and recoverable for the benefit of the Debtor's bankruptcy estate.

391. The total damages suffered by the bankruptcy estate as a result of the fraudulent transfers are subject to proof at trial, but are presently estimated to be no less than $23,775,466.87 plus the patient records.

392. Annex, Achievamed, and Cheng are jointly and severally liable for the fraudulent transfers they received from the Debtor.

**FIFTH CLAIM FOR RELIEF**

**CONSTRUCTIVE FRAUDULENT TRANSFER, CAL. CIV. CODE § 3439.04(a)(2)**

**[Against Annex, Achievamed, Cheng]**

393. Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

394. The Debtor transferred substantially all of its assets to Annex under the APA.

395. The Debtor transferred over $23 million in assets to Annex, including monies SynerMed received in tax returns after the APA, which were not assets transferred in the APA because they were not assets (let alone rights to assets) that existed at the time of the APA.

396. The Debtor also transferred all of its data, including patient records, which records contained PHI.

397. The Debtor allegedly received $250,000 from Annex in exchange for all assets of the Debtor.

398. The Debtor did not receive reasonably equivalent value in exchange for the transfer of assets to Annex, Achievamed, and/or Cheng.

399. The Debtor also fraudulently transferred the Refund Checks to Annex, without any exchange of value.

400. Achievamed and/or Cheng were subsequent transferees of the Debtor's assets.

401. Of the Debtor's assets that Annex received, Annex transferred some or all of those assets to Achievamed and/or Cheng.

402. Cheng and Achievamed are the alter egos of Annex and each other for the purposes of receiving the Debtor's assets after the APA transfer.

403. The Debtor was engaged in a business for which the remaining assets after the APA were unreasonably small in relation to its business.

404. The Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to pay as they became due.

405. The constructive intent fraudulent transfers are avoidable and recoverable for the benefit of the bankruptcy estate.

406. The total damages suffered by the bankruptcy estate as a result of the fraudulent transfers are subject to proof at trial, but are presently estimated to be no less than $23,775,466.87 plus the patient records.

407. Annex, Achievamed, and Cheng are jointly and severally liable for the fraudulent transfers they received from the Debtor.

**SIXTH CLAIM FOR RELIEF**

**TURNOVER OF PROPERTY OF THE ESTATE (11 U.S.C. § 542)**

**[Against Annex, Achievamed, PAMC Ltd., PAMC Inc., PAMC Ltd. Board, and McDermott]**

408. Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

409. The Trustee is informed and believes, and based thereon alleges, that PAMC Ltd., the PAMC Ltd. Board, PAMC Inc., McDermott, Annex, and/or Achievamed, are in possession, custody, or control of property of the Debtor's bankruptcy estate.

410. The Trustee is informed and believes, and based thereon alleges, that PAMC, McDermott, Annex, and/or Achievamed, are in possession, custody, or control of recorded information of the Debtor's bankruptcy estate.

411. The Trustee is informed and believes, and based thereon alleges, that the property of the estate in PAMC Ltd. PAMC Ltd. Board, PAMC Inc., McDermott, Annex, and/or Achievamed's possession, custody, or control is property that the Trustee may use, sell, or lease under 11 U.S.C. § 363.

412. Among other things, these defendants possess (unless spoliated) all of SynerMed's patient data, which data SynerMed was legally obligated to maintain and which data would disclose the names of all persons whose PHI was improperly sold and transferred to Annex and, in turn, Achievamed.

413. The property of the estate also includes all communications between McDermott, PAMC Ltd., PAMC Ltd. Board, and/or PAMC Inc. relating to the sale of SynerMed, the wind down of SynerMed and the governmental inquiries made against SynerMed.

414. The property of the estate also includes monies fraudulently transferred to Annex, Achievamed, and/or Cheng's possession, custody, or control must be delivered to the Trustee or accounted for.

415. The property of the estate in PAMC, McDermott, Annex, and/or Achievamed's possession, custody, or control is not of inconsequential value or benefit to the bankruptcy estate.

416. The Trustee is informed and believes, and based thereon alleges, that after the APA, Annex or Achievamed took possession, custody, or control of substantially all of the property of the Debtor, including all of its monetary assets and all of its patient data and files.

417. The Trustee is informed and believes, and based thereon alleges, that after Annex took possession, custody, or control of substantially all of the property of the Debtor, Annex transferred the Debtor's property to Achievamed.

418. The Trustee is informed and believes, and based thereon alleges, that the Refund Checks are property of the estate, that the Refund Checks or their value is in the possession, custody, or control of Annex or Achievamed, and that the Refund Checks or the value thereof must be delivered or accounted for to the Trustee.

419. The Debtor's recorded information, including books, records, and papers, are among the property that Annex or Achievamed has possession, custody, or control of, which has not been turned over and which records should also be in the possession of McDermott and/or PAMC Ltd., PAMC Ltd. Board and/or PAMC Inc.

420. The Trustee has made written demands to Annex, Achievamed, PAMC Ltd., PAMC Ltd. Board, PAMC Inc., and McDermott for the turnover of property of the estate, and to date, the

Trustee has received no response from them.

421. The property of the estate, or the value thereof, and the Debtor's data (including patient records) and communications must be turned over to the Trustee.

422. The property of the estate that is in the possession of PAMC Ltd. PAMC Ltd. Board, PAMC Inc., McDermott, Annex, and/or Achievamed, is subject to proof at trial, but the value of the property is presently estimated to be at least $23,775,466.87 plus the patient records and communications.

423. The Trustee reserves the right to assert additional claims against each of the Defendants after they turn over the patient data and after the Trustee has sufficient time to provide notice to individuals affected and the relevant governmental agencies.

**SEVENTH CLAIM FOR RELIEF**

**BREACH OF CONTRACT**

**[Against Defendants Annex and Achievamed]**

424. Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

425. Pursuant to the APA, Annex and, subsequently its assignee, Achievamed, agreed to assume certain liabilities of SynerMed.

426. Notwithstanding this promise, Annex failed to provide SynerMed with a defense to the Angeles-IPA or EHS claims, which claims resulted in judgments of approximately $230,000,000.

427. Moreover, Annex is responsible for indemnifying SynerMed for liabilities arising out of the sale and transfer of patient PHI in violation of HIPAA and patients' privacy rights.

428. Moreover, as Annex's Assumed Liabilities, Annex is responsible for indemnifying SynerMed for these liabilities pursuant to the APA.

429. As a result of Annex's and Achievamed's breaches of the APA, SynerMed was damaged in an amount exceeding $250,000,000 and to be proven at trial.

**EIGHTH CLAIM FOR RELIEF**

**GROSS NEGLIGENCE**

**[Against Defendants PAMC Ltd., PAMC Inc., Edwards, Wong, Li, Kwan, Moy, Ma, Chow, and Mason]**

430. Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

431. The Trustee is informed and believes, and based thereon alleges, that in addition to the fiduciary duties owed by Directors to the Debtor and the PAMC Ltd. Board to the Debtor, the Directors and the PAMC Ltd. Board owed a duty of care to the Debtor.

432. The Trustee is informed and believes, and based thereon alleges, that the Directors and the PAMC Ltd. Board breached their duty of care to the Debtor by failing to act reasonably based on a lack of competence, a lack of proper supervision and oversight, and a failure to conduct any due diligence or reasonable inquiry.

433. The Trustee is informed and believes, and based thereon alleges, that the Directors and PAMC Ltd. Board's breach of the duty of care caused actual harm to the Debtor because the Debtor's assets were transferred away while the Debtor was left with substantial liabilities that were not assumed nor enforced under the APA.

434. The Trustee is informed and believes, and based thereon alleges, that the Directors and the PAMC Ltd. Board's actions caused significant depletion of the Debtor's assets and caused the Debtor's liabilities to go unchecked.

435. The Trustee is informed and believes, and based thereon alleges, that the substantial financial issues from the APA was a foreseeable consequence of the failures by the Directors and the PAMC Ltd. Board to make a reasonable inquiry into the APA, Annex, and the ability of Annex to assume all liabilities or potential liabilities.

436. Mason was the President and CEO during the relevant period wherein SynerMed was subject to two whistleblower complaint, government investigations, and the loss of all of its business, which led to lawsuits against SynerMed.

437. The allegations in the whistleblower complaints, substantiated and agreed to in part by SynerMed with the DMHC, arose from Mason's control of and decision-making on behalf of

SynerMed, including rampant falsification and fabrication of files for health plan audits due to inadequate staffing and exposure for violation of Section 1367.02 of the California Health and Safety Code for rendering coverage decisions based primarily on cost.

438. Mason's actions lead to the lawsuits filed by EHS and Angeles-IPA, among other liabilities of SynerMed, as well as SynerMed's insolvency and the loss of all of its business.

439. PAMC Ltd. and PAMC Inc. are alter egos of the Directors for the purposes of their conduct done for the benefit of PAMC Ltd. and PAMC Inc., which conduct was controlled by the PAMC Ltd. Board. Additionally, PAMC Ltd. and PAMC Inc., through the PAMC Ltd. Board, controlled SynerMed's decision to enter into the APA and controlled the day-to-day operations of SynerMed after entry into the APA insofar as SynerMed no longer had any employees and Edwards, as the CEO of PAMC Ltd., was making all such day-to-day decisions on behalf of SynerMed.

440. The Trustee is informed and believes, and based thereon alleges, that the Directors and PAMC Ltd. Board's conduct in breaching their duty of care to the Debtor was a departure from the ordinary standard of care of a reasonably prudent person and presented want of even scant care because their conduct indicates a passive and indifferent attitude towards the consequences that would result from failing to conduct proper oversight, to conduct a reasonable inquiry, to act in good faith, and to hinder creditors from collecting liabilities from the Debtor.

441. The Trustee is informed and believes, and based thereon alleges, that the Directors, PAMC Ltd., and PAMC Inc. caused damages to the Debtor in an amount to be proven at trial, but presently estimated to be in excess of $250,000,000.

## IV. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for a judgment hereon ordering the following relief:

**On the First Claim for Relief:**

1. For general damages according to proof at trial, but estimated to be no less than $250,000,000.

**On the Second Claim for Relief:**

2. For general damages according to proof at trial, but estimated to be no less than $250,000,000.

**On the Third Claim for Relief:**

3. For general damages according to proof at trial, but estimated to be no less than $250,000,000.

**On the Fourth Claim for Relief:**

4. For avoidance and recovery of fraudulent transfers according to proof at trial, but estimated to be no less than $23,775,466.87.

**On the Fifth Claim for Relief:**

5. For avoidance and recovery of fraudulent transfers according to proof at trial, but estimated to be no less than $23,775,466.87.

**On the Sixth Claim for Relief:**

6. For turnover of bankruptcy estate property and turnover of recorded information, and for general damages according to proof at trial, but estimated to be no less than $23,775,466.87.

**On the Seventh Claim for Relief:**

7. For general damages according to proof at trial, but estimated to be no less than $250,000,000.

**On the Eighth Claim for Relief:**

8. For general damages according to proof at trial, but estimated to be no less than $250,000,000.

**As to All Claims for Relief:**

9. Pre-judgment interest and post-judgment interest; and

10. Such other and further relief as is just and proper.

DATED: March 26, 2025

BG LAW LLP

By: ______________________________
Steven T. Gubner
Jason B. Komorsky
Jessica L. Bagdanov
Special Litigation Counsel for Plaintiff Timothy J. Yoo, Chapter 7 Trustee

EXHIBIT 1

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT ("Agreement") is made and entered into as of January 19 2018, by and between **Annex Financial, Inc.**, a California corporation ("Buyer") and **Synermed,** a California corporation ("Seller"). Buyer and Seller may be referred to herein individually as a "Party" and collectively as the "Parties."

## RECITALS

**WHEREAS,** Seller operates a management services operations business (the "Business") which manages medical related plans, providers, etc.; and

**WHEREAS,** Seller wishes to sell to Buyer, and Buyer wish to purchase from Seller, all of the assets of the business (the "Purchased Assets"), and in connection therewith, Buyer is willing to assume all of the liabilities of Seller relating to the Business (the "Assumed Liabilities"), all upon the terms and subject to the conditions set forth herein.

**WHEREAS,** Buyer is aware of the recent California State regulatory investigation of Seller due to allegations of denial of medical care and falsification of records as of November 17, 2017.

**NOW, THEREFORE,** in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

## AGREEMENT

**1. PURCHASE PRICE; CLOSING; DELIVERY**

1.1 Purchase Price. As consideration for acquiring the Purchased Assets, Buyer shall: (a) assume the Assumed Liabilities, and (b) pay to Seller the aggregate purchase price of $250,000.00 (the "Purchase Price"). The Purchase Price shall be paid by Buyer to Seller, in cash or by wire transfer, as follows:

$125,000.00 – within five (5) days of the Closing Date.

$125,000.00 – within fifteen (15) days of the Closing Date.

1.2 Closing.

(a) The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at 10:00 a.m. on January 15, 2018 shall occur at the offices of Seller located at 1680 Corporate Center Drive, Monterey Park, California, or at such other time or places as the Parties may mutually agree (such date is hereinafter referred to as the "Closing Date").

(b) On or prior to the Closing:

(i) Seller shall execute and/or deliver to Buyer full access to bank accounts, bills of sale, endorsements, assignments and other documents as may be reasonably necessary or appropriate to assign, convey, transfer and deliver to Buyer good and valid title to the Purchased Assets, and an assumption of the Assumed Liabilities.

(ii) Seller shall deliver to Buyer copies of the Assumed Contracts.

**2. REPRESENTATIONS AND WARRANTIES OF SELLER**

2.1 Organization, Good Standing and Qualification. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of California.



DM_US 88191816-2.097743.0016

2.2 Authorization. All corporate action on the part of Seller, its officers, directors and stockholders necessary for the authorization, execution and delivery of this Agreement, and the performance of all obligations of Seller hereunder, has been taken or will be taken prior to the Closing Date.

2.3 Litigation. Except as already disclosed to Buyer, there is no pending proceeding, and no person has threatened to commence any proceeding: (a) that involves any of the Purchased Assets or the Business; or (b) that challenges, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, any aspect of the transaction described in this Agreement. There is no order or judgment to which any of the Purchased Assets is subject. Except as already disclosed to Buyer, Seller has not received any notice of any proposed order or judgment that, if issued or otherwise put into effect, (i) would reasonably be expected, either individually or in the aggregate, to have a material adverse effect on Seller, or (ii) may have the effect of preventing, delaying, making illegal or otherwise interfering with the transfer of the Purchased Assets pursuant to this Agreement.

2.4 Intellectual Property.

(a) To Seller's knowledge, Seller's intellectual property is not infringing, misappropriating or making any unlawful use of, and the Business as currently operated by Seller. To Seller's knowledge, Seller's intellectual property has not at any time infringed, misappropriated or made any unlawful use of, or received any notice or other communication of any actual, alleged, possible or potential infringement, misappropriation or unlawful use of, any intellectual property owned or used by any other person. Seller has not received any written notice that any other person is infringing, misappropriating or making any unlawful use of Seller's intellectual property.

(b) Seller is the owner of all right, title, and interest in and to each of Seller's intellectual property, free and clear of all encumbrances and other adverse claims, and has the right to use all of Seller's intellectual property.

(c) Seller is the owner of all right, title, and interest any and all patents if any, free and clear of all encumbrances, and other adverse claims.

2.5 Contracts; Action.

(a) Each Assumed Contract is valid and in full force and effect, and is enforceable by Seller in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(c) No Assumed Contract prohibits Seller from freely engaging in the Business anywhere in the world.

(d) Seller has not waived any of its material rights under any Assumed Contract.

2.6 Tax Matters. All taxes required to have been withheld or paid, and all tax returns required to have been filed, by Seller with respect to the Purchased Assets and the Business have been timely paid (or withheld and paid) or extensions for payment have been properly obtained.

2.7 Governmental Authorizations. Seller has all governmental authorizations necessary for the conduct of the Business, the lack of which could reasonably be expected to have a material adverse effect on Seller. Seller is not in default in any material respect under any of such governmental authorization.

2.8 Title to Property and Assets. Seller owns, and has good, valid and marketable title to, the Purchased Assets free and clear of all encumbrances (except for the Assumed Liabilities). Such Purchased Assets are in good operating condition and repair, ordinary wear and tear excepted, and are free of any material defects.

2.9 Employment Matters.

(a) When delivered pursuant to Section 4.5, the list of employees will be accurate.

(b) All employees and executives will be terminated effective January 15, 2018.

2.10 Compliance With Laws. Except as already disclosed to Buyer, Seller is in compliance in all material respects with the laws applicable to the ownership or use of the Purchased Assets. Except as already disclosed to Buyer, Seller has not received any notice or other communication (in writing or otherwise) from any governmental authority regarding any actual, alleged, possible or potential material violation of, or material failure to comply with, any law that is applicable to the ownership or use of any of the Purchased Assets.

2.11 Finders and Brokers. Seller has not agreed or become obligated to pay, or has taken any action that might result in any person claiming to be entitled to receive, any brokerage commission, finder's fee or similar commission or fee in connection with the transaction described in this Agreement.

**3. REPRESENTATIONS AND WARRANTIES OF BUYER**

3.1 Organization, Good Standing and Qualification. Buyer is a corporation duly organized, validly existing and in good standing under the Laws of California.

3.2 Authorization. All corporate action on the part of Buyer, its officers and directors necessary for the authorization, execution and delivery of this Agreement, and the performance of all obligations of the Buyer has been taken.

3.3 Consents. No consent, notice, registration, qualification, designation, declaration or filing to or with any third party or any governmental authority is required in connection with the consummation of the transaction described in this Agreement, except for those the failure to obtain or file would not have a material adverse effect on Seller.

3.4 Litigation. There is no pending proceeding, and, to the knowledge of Buyer, no person has threatened to commence any proceeding that challenges, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the transaction described in this Agreement. Buyer has not received any notice of any proposed order or judgment that, if issued or otherwise put into effect, may have the effect of preventing, delaying, making illegal or otherwise interfering with the transaction described in this Agreement.

3.5 Finders and Brokers. Buyer has not agreed and will not become obligated to pay, or has not taken any action that might result in any person claiming to be entitled to receive, any brokerage commission, finder' s fee or similar commission or fee in connection with the transaction described in this Agreement.

**4. COVENANTS OF SELLER AND BUYER**

4.1 Access and Investigation. Seller shall use commercially reasonable efforts to provide Buyer with reasonable access, during normal business hours and upon reasonable advance notice, to all existing books, records, tax returns, work papers and other documents and information relating to the Purchased Assets and Business, as well as permit Buyer to have conversations with the customers of the Business and certain identified employees, so long as such conversations have been specifically coordinated by Seller and Seller is permitted to attend all meetings or other conversations with such customers and identified employees.

4.2 Operation of Business. Seller shall use commercially reasonable efforts to:

(a) conduct the Business in the ordinary course, and in the same manner as such operations have been conducted prior to the date of this Agreement.

(b) maintain with respect to the Business, their relations and good will with all suppliers, customers and creditors of the Business, the identified employees and other persons having business relationships with the Business.

(c) not make any capital expenditure that would become a Purchased Asset, except for capital expenditures that are made in the ordinary course, and that, when added to all other capital expenditures made on behalf of Seller, do not exceed $100,000 in the aggregate;

(d) not permit any of the Purchased Assets to become subject to any further Encumbrance.

(e) not agree, commit or offer (in writing or otherwise), and not attempt, to take any of the actions described in clauses (a)-(d) of this Section 4.2.

4.3 Confidentiality; No Shop. All Parties to this Agreement shall ensure that, between the execution of this Agreement and the Closing Dated:

(a) Each Party and its respective representatives comply with the Confidentiality Agreement, dated January 3, 2018 which shall continue in full force and effect in accordance with its terms.

(b) From the date of this Agreement through the earlier of (i) the date that this Agreement is terminated, or (ii) the Closing Date, Seller shall not, and shall cause its representatives not to, directly or indirectly, encourage, solicit, engage in discussions with or provide any information to any person or group concerning any sale or other disposition of all or a material portion of the Purchased Assets other than in the ordinary course of Business. Seller shall promptly communicate to Buyer any unsolicited offer or proposal concerning any such transaction that Seller may receive.

4.4 Bulk Transfer Laws. Each of the Parties agree to waive compliance by the other with the provisions of the bulk sales law of any jurisdiction.

4.5 Employees.

(a) Buyer and Seller acknowledge and agree that Buyer will, by January 15, 2018, make offers of employment to certain employees of the Business (the "Identified Employees"). Promptly after Buyer has selected the Identified Employees, to the extent permitted by applicable laws (and where not so permitted, after consent for disclosure is solicited by Seller and received from Seller's Identified Employee(s)), Seller shall deliver to Buyer a list of employees.

(b) Payment of Severance Pay. Upon turnover of all Seller's cash on hand and accounts, Buyer shall make payment in full to all applicable employees of all severance pay, bonuses, vacation pay, other accrued employment benefit payments on or before the due date for such payment under applicable laws, and otherwise in a manner in accordance with applicable laws. Buyer will assume any of these amounts as part of the Assumed Liabilities.

(c) Employee Liabilities. Buyer shall be responsible for any liabilities related to Seller's employees that have accrued prior to the Closing Date. including, but not limited to, any liabilities associated with the seniority of employees. For the avoidance of doubt, Buyer shall assume all liabilities of any qualified unpaid salary, accrued severance pay. allowances. bonuses and any other remuneration or monetary benefits, and any other obligations owed to the employees of Seller, arising from or in connection with their employment by Seller.

(d) The Parties agree that nothing in this Agreement shall limit Buyer's ability to terminate the employment of any Identified Employee;.

(e) Nothing in this Section 4.5, express or implied, is intended to confer upon any person. including without limitation any Identified Employee, other than the parties hereto or their respective successors and assigns, any rights, remedies. obligations or liabilities under or by reason of this Agreement.

4.6 Communications Received After Closing. Seller authorizes and empowers Buyer on and after the Closing Date to receive and open all mail received by Buyer relating to the Business or the Purchased Assets and to deal with the contents of such communications in any proper manner. Seller shall promptly deliver to Buyer any mail or other communication received by them after the Closing Date pertaining to the Business or the Purchased Assets and any cash. checks or other instruments of payment to which Buyer is entitled. Buyer shall promptly deliver to Seller any mail or other communication received by it after the Closing Date pertaining to the assets and liabilities not transferred to Buyer, and any cash, checks or other instruments of payment in respect thereof.

5. MISCELLANEOUS

5.1 Transaction Expenses. Each Party shall bear and pay its own fees, costs and expenses, including but not limited to all legal, accounting, banking, or broker fees, commissions, and expenses.

5.2 Successors and Assigns. Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties. Nothing in this Agreement, express or implied, is intended to confer upon any Party, other than the Parties hereto or their respective successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

5.3 Governing Law. This Agreement shall be governed by and construed under the laws of the State of California as applied to agreements among California residents entered into and to be performed entirely within California.

5.4 Disputes Resolution; Waiver of Jury Trial.

(a) Except as otherwise provided in this Agreement, the following dispute resolution procedures shall be used by the Parties to resolve all disputes, differences, controversies and claims under this Agreement that arise out of or relate to this Agreement or the interpretation or breach thereof (collectively, "Disputes"). Either Party may, by written notice to the other Party, refer any Dispute for resolution in the manner set forth below.

(b) Any such Disputes shall be referred to arbitration under the rules of the American Arbitration Association, to the extent such rules are not inconsistent with this Section 5.4. Unless the Parties agree on the name of a single arbitrator, the arbitration panel shall consist of three (3) arbitrators, one of whom shall be appointed by Buyer and one of whom shall be appointed by Seller. The two arbitrators thus appointed shall choose the third arbitrator; *provided, however*, that if the two arbitrators are unable to agree on the appointment of the third arbitrator, either arbitrator may petition the American Arbitration Association to make the appointment. Neither Party nor any arbitrator may disclose the existence, content or results of any arbitration hereunder without the prior written consent of Buyer and Seller. The provisions contained in this Section 5.4 shall survive termination and/or expiration of this Agreement.

(c) Unless otherwise mutually agreed to by the Parties, the place of arbitration shall be Pasadena, California.

(d) Each Party shall pay its own expenses in connection with the resolution of Disputes pursuant to this Section 5.4, including attorneys' fees. The fees and expenses of the arbitration panel shall be borne equally by the Buyer, on the one hand, and the Seller, on the other hand, if and to the extent that the arbitration panel determines that such result would be fair and equitable under the circumstances.

(f) Any judicial proceeding brought pursuant to Section 5.4(d) or (g) hereof must be brought in any court of competent jurisdiction in the county of Los Angeles, California and, by execution and delivery of this Agreement, each Party (i) accepts, generally and unconditionally, the exclusive jurisdiction of such courts and any related appellate court, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement, (ii) irrevocably waives any objection it may now or hereafter have as to the venue of any such suit, action or proceeding brought in such a court or that such court is an inconvenient forum, and (iii) waives personal service of process and consents to service of process upon it by certified or registered mail, return receipt requested, at its address specified, and service so made shall be deemed completed on the third business day after such service is deposited in the mail. Nothing in this Section 5.4 shall affect the right of any Party hereto to serve process in any other manner permitted by applicable law.

(g) **IN THE EVENT OF ANY JUDICIAL PROCEEDINGS, THE PARTIES KNOWINGLY AND VOLUNTARILY, AND HAVING HAD AN OPPORTUNITY TO CONSULT WITH COUNSEL, WAIVE ALL RIGHTS TO TRIAL BY JURY, AND AGREE THAT ANY AND ALL MATTERS SHALL BE DECIDED BY A JUDGE WITHOUT A JURY TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW.**

5.5 Titles and Subtitles. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

5.6 Notices. All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the Party to be notified; (b) when sent by confirmed telex or facsimile if sent during normal business hours of the recipient, if not, then on the next business day; (c) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (d) one day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the address as set forth on the signature page hereof or at such other address as such Party may designate by ten days advance written notice to the other Parties hereto.

5.7 Amendments and Waivers. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of Seller and Buyer. Any amendment or waiver effected in accordance with this paragraph shall be binding upon each Party hereto.

5.8 Severability. If one or more provisions of this Agreement are held to be unenforceable under applicable Law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

5.9 Entire Agreement. This Agreement constitutes the entire agreement between the Parties and supersedes all prior agreements and understandings, oral and written, between the Parties hereto. No Party shall be liable or bound to any other Party in any manner by any covenants or representations or warranties, express or implied, at common law, by statute or otherwise, except as to those representations, warranties and covenants set forth herein, and such representations, warranties and covenants shall expire five business days after the Closing Date. Seller hereby disclaims all implied warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the Purchased Assets.

5.10 Public Disclosures. Unless otherwise required by law, prior to the Closing Date, no news release or other public announcement pertaining to the transactions contemplated by this Agreement will be made by or on behalf of any Party without the prior approval of the other Party.

5.11 Counterparts; Facsimile. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. This Agreement (or any counterpart hereof) may be delivered by a Party by facsimile or electronic submission, and which facsimile or electronic delivery shall be effective as if the original counterpart had been delivered.

5.12 Further Assurances. The Parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date first above written.

**SYNERMED ~~TECHNOLOGIES~~, INC.**

By: [signature]
Name: JOHN EDWARDS
Title: ______________

Address: Synermed ~~Technologies~~, Inc.
16[illegible]0 Corporate Center Drive
Monterey Park, CA 91754

With a copy to:

**ANNEX FINANCIAL, INC.**

By: [signature]
Name: MIA ADAMSON
Title: President

Address: Annex Financial, Inc.
115 W. California Blvd.
Pasadena, CA 91103

With a copy to:



DM_US 88191816-2.097743.0016

EXHIBIT 2

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT ("Agreement") is made and entered into as of January 19 2018, by and between **Annex Financial, Inc.**, a California corporation ("Buyer") and **Synermed**, a California corporation ("Seller"). Buyer and Seller may be referred to herein individually as a "Party" and collectively as the "Parties."

## RECITALS

**WHEREAS,** Seller operates a management services operations business (the "Business") which manages medical related plans, providers, etc.; and

**WHEREAS,** Seller wishes to sell to Buyer, and Buyer wish to purchase from Seller, all of the assets of the business (the "Purchased Assets"), and in connection therewith, Buyer is willing to assume all of the liabilities of Seller relating to the Business (the "Assumed Liabilities"), all upon the terms and subject to the conditions set forth herein.

**WHEREAS,** Buyer is aware of the recent California State regulatory investigation of Seller due to allegations of denial of medical care and falsification of records as of November 17, 2017.

**NOW, THEREFORE,** in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

## AGREEMENT

### 1. PURCHASE PRICE; CLOSING; DELIVERY

1.1 Purchase Price. As consideration for acquiring the Purchased Assets, Buyer shall: (a) assume the Assumed Liabilities, and (b) pay to Seller the aggregate purchase price of $250,000.00 (the "Purchase Price"). The Purchase Price shall be paid by Buyer to Seller, in cash or by wire transfer, as follows:

$125,000.00 – within five (5) days of the Closing Date.

$125,000.00 – within fifteen (15) days of the Closing Date.

1.2 Closing.

(a) The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at 10:00 a.m. on January 15, 2018 shall occur at the offices of Seller located at 1680 Corporate Center Drive, Monterey Park, California, or at such other time or places as the Parties may mutually agree (such date is hereinafter referred to as the "Closing Date").

(b) On or prior to the Closing:

(i) Seller shall execute and/or deliver to Buyer full access to bank accounts, bills of sale, endorsements, assignments and other documents as may be reasonably necessary or appropriate to assign, convey, transfer and deliver to Buyer good and valid title to the Purchased Assets, and an assumption of the Assumed Liabilities.

(ii) Seller shall deliver to Buyer copies of the Assumed Contracts.

### 2. REPRESENTATIONS AND WARRANTIES OF SELLER

2.1 Organization, Good Standing and Qualification. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of California.

2.2 Authorization. All corporate action on the part of Seller, its officers, directors and stockholders necessary for the authorization, execution and delivery of this Agreement, and the performance of all obligations of Seller hereunder, has been taken or will be taken prior to the Closing Date.

2.3 Litigation. Except as already disclosed to Buyer, there is no pending proceeding, and no person has threatened to commence any proceeding: (a) that involves any of the Purchased Assets or the Business; or (b) that challenges, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, any aspect of the transaction described in this Agreement. There is no order or judgment to which any of the Purchased Assets is subject. Except as already disclosed to Buyer, Seller has not received any notice of any proposed order or judgment that, if issued or otherwise put into effect, (i) would reasonably be expected, either individually or in the aggregate, to have a material adverse effect on Seller, or (ii) may have the effect of preventing, delaying, making illegal or otherwise interfering with the transfer of the Purchased Assets pursuant to this Agreement.

2.4 Intellectual Property.

(a) To Seller's knowledge, Seller's intellectual property is not infringing, misappropriating or making any unlawful use of, and the Business as currently operated by Seller. To Seller's knowledge, Seller's intellectual property has not at any time infringed, misappropriated or made any unlawful use of, or received any notice or other communication of any actual, alleged, possible or potential infringement, misappropriation or unlawful use of, any intellectual property owned or used by any other person. Seller has not received any written notice that any other person is infringing, misappropriating or making any unlawful use of Seller's intellectual property.

(b) Seller is the owner of all right, title, and interest in and to each of Seller's intellectual property, free and clear of all encumbrances and other adverse claims, and has the right to use all of Seller's intellectual property.

(c) Seller is the owner of all right, title, and interest any and all patents if any, free and clear of all encumbrances, and other adverse claims.

2.5 Contracts; Action.

(a) Each Assumed Contract is valid and in full force and effect, and is enforceable by Seller in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(c) No Assumed Contract prohibits Seller from freely engaging in the Business anywhere in the world.

(d) Seller has not waived any of its material rights under any Assumed Contract.

2.6 Tax Matters. All taxes required to have been withheld or paid, and all tax returns required to have been filed, by Seller with respect to the Purchased Assets and the Business have been timely paid (or withheld and paid) or extensions for payment have been properly obtained.

2.7 Governmental Authorizations. Seller has all governmental authorizations necessary for the conduct of the Business, the lack of which could reasonably be expected to have a material adverse effect on Seller. Seller is not in default in any material respect under any of such governmental authorization.

2.8 Title to Property and Assets. Seller owns, and has good, valid and marketable title to, the Purchased Assets free and clear of all encumbrances (except for the Assumed Liabilities). Such Purchased Assets are in good operating condition and repair, ordinary wear and tear excepted, and are free of any material defects.

2.9 Employment Matters.

(a) When delivered pursuant to Section 4.5, the list of employees will be accurate.

removed per page 7

(b) All employees and executives will be terminated effective January 15, 2018.

2.10 Compliance With Laws. Except as already disclosed to Buyer, Seller is in compliance in all material respects with the laws applicable to the ownership or use of the Purchased Assets. Except as already disclosed to Buyer, Seller has not received any notice or other communication (in writing or otherwise) from any governmental authority regarding any actual, alleged, possible or potential material violation of, or material failure to comply with, any law that is applicable to the ownership or use of any of the Purchased Assets.

2.11 Finders and Brokers. Seller has not agreed or become obligated to pay, or has taken any action that might result in any person claiming to be entitled to receive, any brokerage commission, finder's fee or similar commission or fee in connection with the transaction described in this Agreement.

**3. REPRESENTATIONS AND WARRANTIES OF BUYER**

3.1 Organization, Good Standing and Qualification. Buyer is a corporation duly organized, validly existing and in good standing under the Laws of California.

3.2 Authorization. All corporate action on the part of Buyer, its officers and directors necessary for the authorization, execution and delivery of this Agreement, and the performance of all obligations of the Buyer has been taken.

3.3 Consents. No consent, notice, registration, qualification, designation, declaration or filing to or with any third party or any governmental authority is required in connection with the consummation of the transaction described in this Agreement, except for those the failure to obtain or file would not have a material adverse effect on Seller.

3.4 Litigation. There is no pending proceeding, and, to the knowledge of Buyer, no person has threatened to commence any proceeding that challenges, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the transaction described in this Agreement. Buyer has not received any notice of any proposed order or judgment that, if issued or otherwise put into effect, may have the effect of preventing, delaying, making illegal or otherwise interfering with the transaction described in this Agreement.

3.5 Finders and Brokers. Buyer has not agreed and will not become obligated to pay, or has not taken any action that might result in any person claiming to be entitled to receive, any brokerage commission, finder' s fee or similar commission or fee in connection with the transaction described in this Agreement.

**4. COVENANTS OF SELLER AND BUYER**

4.1 Access and Investigation. Seller shall use commercially reasonable efforts to provide Buyer with reasonable access, during normal business hours and upon reasonable advance notice, to all existing books, records, tax returns, work papers and other documents and information relating to the Purchased Assets and Business, as well as permit Buyer to have conversations with the customers of the Business and certain identified employees, so long as such conversations have been specifically coordinated by Seller and Seller is permitted to attend all meetings or other conversations with such customers and identified employees.

4.2 Operation of Business. Seller shall use commercially reasonable efforts to:

(a) conduct the Business in the ordinary course, and in the same manner as such operations have been conducted prior to the date of this Agreement.

(b) maintain with respect to the Business, their relations and good will with all suppliers, customers and creditors of the Business, the identified employees and other persons having business relationships with the Business.

(c) not make any capital expenditure that would become a Purchased Asset, except for capital expenditures that are made in the ordinary course, and that, when added to all other capital expenditures made on behalf of Seller, do not exceed $100,000 in the aggregate;

(d) not permit any of the Purchased Assets to become subject to any further Encumbrance.

(e) not agree, commit or offer (in writing or otherwise), and not attempt, to take any of the actions described in clauses (a)-(d) of this Section 4.2.

4.3 Confidentiality; No Shop. All Parties to this Agreement shall ensure that, between the execution of this Agreement and the Closing Dated:

(a) Each Party and its respective representatives comply with the Confidentiality Agreement, dated January 3, 2018 which shall continue in full force and effect in accordance with its terms.

(b) From the date of this Agreement through the earlier of (i) the date that this Agreement is terminated, or (ii) the Closing Date, Seller shall not, and shall cause its representatives not to, directly or indirectly, encourage, solicit, engage in discussions with or provide any information to any person or group concerning any sale or other disposition of all or a material portion of the Purchased Assets other than in the ordinary course of Business. Seller shall promptly communicate to Buyer any unsolicited offer or proposal concerning any such transaction that Seller may receive.

4.4 Bulk Transfer Laws. Each of the Parties agree to waive compliance by the other with the provisions of the bulk sales law of any jurisdiction.

~~4.5 Employees.~~

4.5 deleted

(a) Buyer and Seller acknowledge and agree that Buyer will, by January 15, 2018, make offers of employment to certain employees of the Business (the "Identified Employees"). Promptly after Buyer has selected the Identified Employees, to the extent permitted by applicable laws (and where not so permitted, after consent for disclosure is solicited by Seller and received from Seller's Identified Employee(s)), Seller shall deliver to Buyer a list of employees.

(b) Payment of Severance Pay. Upon turnover of all Seller's cash on hand and accounts, Buyer shall make payment in full to all applicable employees of all severance pay, bonuses, vacation pay, other accrued employment benefit payments on or before the due date for such payment under applicable laws, and otherwise in a manner in accordance with applicable laws. Buyer will assume any of these amounts as part of the Assumed Liabilities.

(c) Employee Liabilities. Buyer shall be responsible for any liabilities related to Seller's employees that have accrued prior to the Closing Date, including, but not limited to, any liabilities associated with the seniority of employees. For the avoidance of doubt, Buyer shall assume all liabilities of any qualified unpaid salary, accrued severance pay, allowances, bonuses and any other remuneration or monetary benefits, and any other obligations owed to the employees of Seller, arising from or in connection with their employment by Seller.

(d) The Parties agree that nothing in this Agreement shall limit Buyer's ability to terminate the employment of any Identified Employee;.

(e) Nothing in this Section 4.5, express or implied, is intended to confer upon any person, including without limitation any Identified Employee, other than the parties hereto or their respective successors and ~~assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.~~

4.6 Communications Received After Closing. Seller authorizes and empowers Buyer on and after the Closing Date to receive and open all mail received by Buyer relating to the Business or the Purchased Assets and to deal with the contents of such communications in any proper manner. Seller shall promptly deliver to Buyer any mail or other communication received by them after the Closing Date pertaining to the Business or the Purchased Assets and any cash, checks or other instruments of payment to which Buyer is entitled. Buyer shall promptly deliver to Seller any mail or other communication received by it after the Closing Date pertaining to the assets and liabilities not transferred to Buyer, and any cash, checks or other instruments of payment in respect thereof.

5. **MISCELLANEOUS**

5.1 Transaction Expenses. Each Party shall bear and pay its own fees, costs and expenses, including but not limited to all legal, accounting, banking, or broker fees, commissions, and expenses.

5.2 Successors and Assigns. Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties. Nothing in this Agreement, express or implied, is intended to confer upon any Party, other than the Parties hereto or their respective successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

5.3 Governing Law. This Agreement shall be governed by and construed under the laws of the State of California as applied to agreements among California residents entered into and to be performed entirely within California.

5.4 Disputes Resolution; Waiver of Jury Trial.

(a) Except as otherwise provided in this Agreement, the following dispute resolution procedures shall be used by the Parties to resolve all disputes, differences, controversies and claims under this Agreement that arise out of or relate to this Agreement or the interpretation or breach thereof (collectively, "Disputes"). Either Party may, by written notice to the other Party, refer any Dispute for resolution in the manner set forth below.

(b) Any such Disputes shall be referred to arbitration under the rules of the American Arbitration Association, to the extent such rules are not inconsistent with this Section 5.4. Unless the Parties agree on the name of a single arbitrator, the arbitration panel shall consist of three (3) arbitrators, one of whom shall be appointed by Buyer and one of whom shall be appointed by Seller. The two arbitrators thus appointed shall choose the third arbitrator; *provided, however*, that if the two arbitrators are unable to agree on the appointment of the third arbitrator, either arbitrator may petition the American Arbitration Association to make the appointment. Neither Party nor any arbitrator may disclose the existence, content or results of any arbitration hereunder without the prior written consent of Buyer and Seller. The provisions contained in this Section 5.4 shall survive termination and/or expiration of this Agreement.

(c) Unless otherwise mutually agreed to by the Parties, the place of arbitration shall be Pasadena, California.

(d) Each Party shall pay its own expenses in connection with the resolution of Disputes pursuant to this Section 5.4, including attorneys' fees. The fees and expenses of the arbitration panel shall be borne equally by the Buyer, on the one hand, and the Seller, on the other hand, if and to the extent that the arbitration panel determines that such result would be fair and equitable under the circumstances.

(f) Any judicial proceeding brought pursuant to Section 5.4(d) or (g) hereof must be brought in any court of competent jurisdiction in the county of Los Angeles, California and, by execution and delivery of this Agreement, each Party (i) accepts, generally and unconditionally, the exclusive jurisdiction of such courts and any related appellate court, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement, (ii) irrevocably waives any objection it may now or hereafter have as to the venue of any such suit, action or proceeding brought in such a court or that such court is an inconvenient forum, and (iii) waives personal service of process and consents to service of process upon it by certified or registered mail, return receipt requested, at its address specified, and service so made shall be deemed completed on the third business day after such service is deposited in the mail. Nothing in this Section 5.4 shall affect the right of any Party hereto to serve process in any other manner permitted by applicable law.

(g) **IN THE EVENT OF ANY JUDICIAL PROCEEDINGS, THE PARTIES KNOWINGLY AND VOLUNTARILY, AND HAVING HAD AN OPPORTUNITY TO CONSULT WITH COUNSEL, WAIVE ALL RIGHTS TO TRIAL BY JURY, AND AGREE THAT ANY AND ALL MATTERS SHALL BE DECIDED BY A JUDGE WITHOUT A JURY TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW.**

5.5 Titles and Subtitles. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

5.6 Notices. All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the Party to be notified; (b) when sent by confirmed telex or facsimile if sent during normal business hours of the recipient, if not, then on the next business day; (c) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (d) one day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the address as set forth on the signature page hereof or at such other address as such Party may designate by ten days advance written notice to the other Parties hereto.

5.7 Amendments and Waivers. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of Seller and Buyer. Any amendment or waiver effected in accordance with this paragraph shall be binding upon each Party hereto.

5.8 Severability. If one or more provisions of this Agreement are held to be unenforceable under applicable Law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

5.9 Entire Agreement. This Agreement constitutes the entire agreement between the Parties and supersedes all prior agreements and understandings, oral and written, between the Parties hereto. No Party shall be liable or bound to any other Party in any manner by any covenants or representations or warranties, express or implied, at common law, by statute or otherwise, except as to those representations, warranties and covenants set forth herein, and such representations, warranties and covenants shall expire five business days after the Closing Date. Seller hereby disclaims all implied warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the Purchased Assets.

5.10 Public Disclosures. Unless otherwise required by law, prior to the Closing Date, no news release or other public announcement pertaining to the transactions contemplated by this Agreement will be made by or on behalf of any Party without the prior approval of the other Party.

5.11 Counterparts; Facsimile. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. This Agreement (or any counterpart hereof) may be delivered by a Party by facsimile or electronic submission, and which facsimile or electronic delivery shall be effective as if the original counterpart had been delivered.

5.12 Further Assurances. The Parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date first above written.

**SYNERMED ~~TECHNOLOGIES~~, INC.**

By: [signature]
Name: JOHN EDWARDS
Title:

Address: Synermed ~~Technologies~~, Inc.
16[illegible]0 Corporate Center Drive
Monterey Park, CA 91754

With a copy to:

**ANNEX FINANCIAL, INC.**

By: [signature]
Name: MIA ADAMSON
Title: President

Address: Annex Financial, Inc.
115 W. California Blvd.
Pasadena, CA 91103

With a copy to:



DM_US 88191816-2.097743.0016

[illegible]

2.10 Compliance With Laws. Except as already disclosed to Buyer, Seller is in compliance in all material respects with the laws applicable to the ownership or use of the Purchased Assets. Except as already disclosed to Buyer, Seller has not received any notice or other communication (in writing or otherwise) from any governmental authority regarding any actual, alleged, possible or potential material violation of, or material failure to comply with, any law that is applicable to the ownership or use of any of the Purchased Assets.

2.11 Finders and Brokers. Seller has not agreed or become obligated to pay, or has taken any action that might result in any person claiming to be entitled to receive, any brokerage commission, finder's fee or similar commission or fee in connection with the transaction described in this Agreement.

**3. REPRESENTATIONS AND WARRANTIES OF BUYER**

3.1 Organization, Good Standing and Qualification. Buyer is a corporation duly organized, validly existing and in good standing under the Laws of California.

3.2 Authorization. All corporate action on the part of Buyer, its officers and directors necessary for the authorization, execution and delivery of this Agreement, and the performance of all obligations of the Buyer has been taken.

3.3 Consents. No consent, notice, registration, qualification, designation, declaration or filing to or with any third party or any governmental authority is required in connection with the consummation of the transaction described in this Agreement, except for those the failure to obtain or file would not have a material adverse effect on Seller.

3.4 Litigation. There is no pending proceeding, and, to the knowledge of Buyer, no person has threatened to commence any proceeding that challenges, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the transaction described in this Agreement. Buyer has not received any notice of any proposed order or judgment that, if issued or otherwise put into effect, may have the effect of preventing, delaying, making illegal or otherwise interfering with the transaction described in this Agreement.

3.5 Finders and Brokers. Buyer has not agreed and will not become obligated to pay, or has not taken any action that might result in any person claiming to be entitled to receive, any brokerage commission, finder' s fee or similar commission or fee in connection with the transaction described in this Agreement.

**4. COVENANTS OF SELLER AND BUYER**

4.1 Access and Investigation. Seller shall use commercially reasonable efforts to provide Buyer with reasonable access, during normal business hours and upon reasonable advance notice, to all existing books, records, tax returns, work papers and other documents and information relating to the Purchased Assets and Business, as well as permit Buyer to have conversations with the customers of the Business and certain identified employees, so long as such conversations have been specifically coordinated by Seller and Seller is permitted to attend all meetings or other conversations with such customers and identified employees.

4.2 Operation of Business. Seller shall use commercially reasonable efforts to:

(a) conduct the Business in the ordinary course, and in the same manner as such operations have been conducted prior to the date of this Agreement.

(b) maintain with respect to the Business, their relations and good will with all suppliers, customers and creditors of the Business, the identified employees and other persons having business relationships with the Business.

(c) not make any capital expenditure that would become a Purchased Asset, except for capital expenditures that are made in the ordinary course, and that, when added to all other capital expenditures made on behalf of Seller, do not exceed $100,000 in the aggregate;